2002-NMCA-009

39 P.3d 710

**WESTSTAR MORTGAGE CORPORATION, Plaintiff/Counterdefendant–Appellant/Cross–Appellee,**

v.

**Ken JACKSON, Defendant/Counterplaintiff–Appellee/Cross–Appellant.**

**No. 21,179.**

Court of Appeals of New Mexico.

Nov. 26, 2001.

Certiorari Granted, No. 27,270, Jan. 15, 2002.

Alice Tomlinson Lorenz, James J. Widland, Miller, Stratvert & Torgerson, P.A., Albuquerque, NM, for Appellant/Cross–Appellee.

Joseph P. Kennedy, Albuquerque, NM, for Appellee/Cross–Appellant.

## OPINION

PICKARD, Judge.

{1} The question before us is whether the use of the criminal process to assist in the collection of money mistakenly deposited into the wrong account gives rise to civil liability under the tort of malicious abuse of process. *See DeVaney v. Thriftway Mktg. Corp.,* 1998–NMSC–001, ¶ 17, 124 N.M. 512, 953 P.2d 277 (defining the elements of malicious abuse of process). In addition, we address whether NMSA 1978, § 56–8–4(A) (1993) requires a trial court to apply post-judgment interest to an award of punitive damages. Under the specific facts of this case, we answer both questions in the affirmative.

{2} Appellant Weststar Mortgage Company (Weststar) appeals from a judgment awarding Appellee Ken Jackson (Jackson) $50,000 in compensatory damages and $150,000 in punitive damages on Jackson's claim for malicious abuse of process. Weststar challenges the jury's verdict on every element of the malicious abuse of process claim and on the award of punitive damages. In particular, Weststar argues that (1) Weststar did not initiate or procure criminal proceedings against Jackson; (2) the trial court erred by failing to find, as a matter of law, that Weststar had probable cause to believe that a criminal claim could be established against Jackson; (3) the claim for malicious abuse of process was precluded by the facts that Jackson was guilty of larceny and the criminal proceedings did not terminate in Jackson's favor; (4) Weststar did not misuse the criminal proceedings; (5) there was no evidence that Weststar had a primary improper motive in seeking the criminal prosecution; (6) the jury instructions were misleading; (7) the jury's award of punitive damages was not supported by substantial evidence; and (8) the trial court erred in denying Weststar's motion for a new trial given that Jackson failed to present evidence sufficient to support the jury's findings. Jackson raises only one issue on cross-appeal, namely whether the trial court erred in failing to award post-judgment interest on Jackson's punitive damages award. We affirm on the appeal, reverse on the cross-appeal, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

{3} Weststar is an escrow company that provides escrow, loan, and mortgage servicing. Its services include holding real estate contracts, collecting payments, and disbursing proceeds. Weststar also purchases real estate contracts.

{4} In 1998, Jackson owned a real estate contract encumbered by a mortgage. Weststar held the contract and disbursed payments to Jackson and to the mortgage holder. In April 1998, Weststar and Jackson executed a contract for Jackson to sell his real estate contract to Weststar. Pursuant to this agreement, Weststar arranged to direct-deposit approximately $3,000 in Jackson's account at Norwest Bank. However, Norwest misunderstood Weststar's instructions and mistakenly transferred all of the sale proceeds, including $12,927.26 that should have gone into Weststar's account, into Jackson's account.

{5} Jackson and his wife discovered the error several days later. On his wife's advice, Jackson called Weststar to ask whether the wire transfer had been made correctly. Jackson admits that he did not tell Weststar why he thought there may have been a mistake during this phone call. The Weststar representative, Lori Lynch, told Jackson that the wire transfer had been completed. Jackson then withdrew $12,000 from his account and purchased a certificate of deposit. Jackson testified that he bought the CD because he thought Weststar might eventually want the money returned and he wanted to ensure that he did not spend it.

{6} When Weststar discovered the bank error in July 1998, Lynch called Jackson.

During this first telephone call, Jackson denied having any knowledge of the money. However, later that day, Jackson called Lynch and arranged to return the money when the CD matured in August. Lynch testified that she did not demand that Jackson immediately return the money: "At that point he seemed willing to find out what he could do about the CD and return the money to us, so we were allowing him some time to do that."

{7} Shortly after Lynch and Jackson made arrangements for the repayment of the money, Weststar's attorney sent a letter to Jackson, demanding return of the money and threatening legal action should Jackson fail to cooperate. Concerned by the tone of the letter, Jackson and his wife contacted an attorney. The attorney erroneously, if not recklessly, told Jackson that it was his "lucky day" and that he was entitled to keep the money. Based on this advice, Jackson cashed in the CD and deposited the proceeds into another account.

{8} As the CD maturity date approached, Lynch again called Jackson. Jackson told Lynch that he had retained counsel and directed her to communicate with him through his attorney. Lynch reported this conversation to her supervisor, Gary Inman. Inman then called Jackson's attorney. Jackson's attorney told Inman that he viewed the situation as a "golden opportunity" for Jackson and that he would be responding to Weststar's demand letter in due time.

{9} Inman or another supervisor then directed Lynch to make a complaint with the Carlsbad Police Department. Lynch met with Detective Boutelle on September 23, 1998. Boutelle testified that Lynch told him, "We want to avoid going to criminal court, if we can. We are hoping we get cooperation, and can get this resolved where we can just close the whole matter out and go from there." Boutelle explained that he was not a collection agent and asked if Weststar wanted to proceed with the prosecution of Jackson. Lynch responded that she lacked the authority to authorize the prosecution and that her purpose in contacting the police was to document the situation in the event that Weststar was unable to resolve the situation civilly.

{10} Based on Lynch's representations that Weststar wanted to avoid a criminal prosecution if possible, Boutelle called Jackson's attorney to attempt to resolve the situation. Lynch was in the room at the time Boutelle made the call. Boutelle testified that he told the attorney, "I'm asking that you might talk to your client and try to come up with a reasonable solution, so that I can be eliminated from this process and you-all handle it yourselves. Otherwise I will be compelled—I will have to do my job and pursue this further." Jackson's attorney laughed at Boutelle and told Boutelle that he did not believe the matter was a criminal issue.

{11} The following day, Inman called Boutelle and directed the detective to pursue the prosecution of Jackson. During this conversation, Inman told Boutelle that he had received a letter from Jackson's attorney basically stating that Jackson would not be returning the money. In fact, the letter discussed a settlement offer. Nonetheless, Inman told Boutelle that the letter was not the answer he was hoping to get from Jackson and therefore that Weststar wished to proceed with the criminal case.

{12} Jackson did not return the money and was arrested. The district attorney eventually dismissed the prosecution because he was unable to get necessary records from Norwest Bank in order to carry through with the trial before a required deadline.

{13} Shortly after Jackson's arrest, Weststar filed a civil complaint alleging unjust enrichment, fraud, constructive fraud, conversion, and promissory estoppel. Jackson counterclaimed for malicious abuse of process. After Jackson acquired new counsel and repaid the money, Weststar obtained partial summary judgment on its claim of unjust enrichment to memorialize Jackson's repayment of the money.

{14} Weststar filed a motion for summary judgment on Jackson's claim of malicious abuse of process. The trial court did not rule on the motion, and the counterclaim was tried to a jury. The jury found in favor of

Jackson and awarded $50,000 in compensatory damages and $150,000 in punitive damages. Weststar then filed a motion for judgment as a matter of law or, in the alternative, for a new trial. The trial court denied the motion.

{15} At the presentment hearing, Jackson asked for pre- and post-judgment interest on both the compensatory and punitive damages awards. The trial court denied Jackson's request and awarded pre- and post-judgment interest on the compensatory damages only. Weststar appeals from the judgment and damages awards, and Jackson cross-appeals from the failure to award post-judgment interest on the punitive damages award.

## DISCUSSION

### I. Malicious Abuse of Process

{16} The tort of malicious abuse of process represents "an attempt to strike a balance between the interest in protecting litigants' right of access to the courts and the interest in protecting citizens from unfounded or illegitimate applications of the power of the state through the misuse of the courts." *DeVaney*, 1998–NMSC–001, ¶ 14, 124 N.M. 512, 953 P.2d 277. Because of the importance of the right of access to the courts, the tort is disfavored in the law and must be narrowly construed. *Id.* ¶ 19.

{17} The elements of malicious abuse of process are:

(1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages.

*Id.* ¶ 17. To sustain an action for malicious abuse of process, "there must be both a misuse of the power of the judiciary by a litigant and a malicious motive." *Id.*

### A. Standard of Review

{18} Weststar challenges the legal and factual sufficiency of the jury's verdict. In determining whether the evidence is legally sufficient to support the verdict, we resolve all disputes of facts and indulge all reasonable inferences in favor of the prevailing party. *Las Cruces Prof'l Fire Fighters v. Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. We do not reweigh the evidence and do not substitute our judgment for that of the fact finder. *Id.* "The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Id.* Under the traditional standard of appellate review applicable to this case, we disregard all evidence and inferences unfavorable to the jury's verdict. *See Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 126–27, 767 P.2d 363, 365–66 (Ct.App.1988). The dissent does not appear to take this admonition to "disregard" unfavorable evidence and inferences to heart.

### B. Initiation or Procurement of Judicial Proceedings

{19} Weststar asserts two challenges to the jury's finding that it initiated or procured the criminal prosecution of Jackson: (1) the court erred in instructing the jury that it could hold Weststar liable for procuring, rather than initiating, the prosecution; and (2) Weststar could not be held liable as a matter of law because Detective Boutelle conducted an independent investigation of the allegations against Jackson and the district attorney made the ultimate decision to prosecute. We conclude that the jury was properly instructed and the evidence was sufficient to support a finding that the decision to prosecute Jackson was made at the request and insistence of Weststar.

### 1. Jury Instruction

{20} The jury was instructed that Jackson bore the burden of proving that "Weststar initiated or procured criminal proceedings against Jackson." Weststar's challenge to this instruction focuses on the absence of the term "procured" from the definition of malicious abuse of process given by our Supreme Court in *DeVaney*. *See* 1998–NMSC–001, ¶ 17, 124 N.M. 512, 953 P.2d 277. We reject Weststar's argument. Although *DeVaney* changed the law of malicious prosecution and abuse of process by merging the torts into one cause of action, the cases addressing the

separate torts are still helpful in our analysis of the requirements of the unified tort. This is particularly true in a case such as the one at bar, where the claim arises from a criminal prosecution rather than a civil claim as was at issue in *DeVaney*. *See id.* ¶ 4.

■ {21} New Mexico cases involving liability for a criminal prosecution have consistently defined the first element of malicious abuse of the criminal process as requiring proof that the " 'defendant initiated, *or procured* the institution of, criminal proceedings against plaintiff without probable cause.' " *Johnson v. Weast,* 1997–NMCA–066, ¶ 19, 123 N.M. 470, 943 P.2d 117 (quoting *Zamora v. Creamland Dairies, Inc.,* 106 N.M. 628, 632, 747 P.2d 923, 927 (Ct.App.1987)) (emphasis added). The inclusion of the term "procured" in assessing liability is consistent with the Restatement of Torts, on which our cases have relied in defining the elements of the tort. *See* RESTATEMENT (SECOND) OF TORTS § 653 (1976). "[O]ne who procures a third person to institute criminal proceedings against another is liable under the same conditions as though he had himself initiated the proceedings." *Id.* cmt. d.

## 2. Initiation or Procurement

■ {22} When a malicious abuse of process claim is predicated on a criminal prosecution, the evidence must show that a complainant took an active part in instigating or encouraging the prosecution before the complainant may be held liable. *Zamora,* 106 N.M. at 633, 747 P.2d at 928. If a complainant gives a prosecutor information believed to be true, "and the officer, in the exercise of his uncontrolled discretion, initiates proceedings based on that information, the informer is not liable." *Id.* at 632, 747 P.2d at 927. " 'There can be no liability where the prosecuting officer relies upon his own investigation and upon information furnished by others than defendant or where defendant has himself fairly disclosed, and it is left to the officer's own discretion, judgment and responsibility as to whether there shall be a prosecution.' " *Id.* (quoting *Hughes v. Van Bruggen,* 44 N.M. 534, 540, 105 P.2d 494, 498 (1940)).

■ {23} Weststar argues that the evidence was undisputed that it provided information that it believed to be true and that Boutelle conducted his own investigation. We disagree. First, we note that evidence was presented that Inman told Boutelle that Jackson admitted removing the money from his bank account in order to prevent the bank from correcting its error and that Jackson refused to return the money. However, Jackson testified that he removed the money from his bank account and purchased the CD to insure that he did not accidently spend the money by mingling it with his own funds. In addition, the letter upon which Inman based his statement that Jackson refused to return the money was actually an offer to settle the dispute and explained why Jackson and his attorney believed that Jackson might be entitled to keep a portion of the disputed funds. Under these circumstances, a jury could infer that Weststar had provided Boutelle with misleading information.

{24} Second, we disagree with Weststar's characterization of Boutelle's investigation as independent. From the record, it appears that Boutelle's investigation consisted of requesting additional documentation from Weststar and perhaps requesting documents from Norwest Bank. However, neither Boutelle nor the district attorney were able to secure records from Norwest. As such, the prosecution was based solely on the information provided by Weststar. This lack of independent investigation and corroboration is in marked contrast to the facts of *Zamora,* on which Weststar relies in its brief in chief. In *Zamora,* the defendants provided an investigative report to the police and filed an offense report at the request of the police. 106 N.M. at 632–33, 747 P.2d at 927–28. During their investigation of the defendants' allegations, the police interviewed twelve people other than the defendants. In addition, in deciding to prosecute, the district attorney relied on the results of the police investigation and used a confidential informant in connection with the case. *Id.* In this case, Boutelle's investigation was based solely on information provided by Weststar, and the evidence suggests that the district attorney's decision to prosecute was based solely on Boutelle's representation of the

facts as provided by Weststar and included in the police report. Under these circumstances, we conclude that the investigation by Boutelle was not independent of Weststar.

{25} Nonetheless, Weststar suggests that, to hold a complainant liable for initiating a criminal prosecution, the evidence must show that the complainant exercised undue influence upon the prosecuting authorities so as to effectively usurp the authorities' discretion. We disagree. A complainant who persuades, requests, directs, or pressures prosecuting authorities to proceed with a prosecution can be regarded in proper circumstances as initiating the prosecution and be held liable for it. *See id.* at 633, 747 P.2d at 928; *Kurschus v. PaineWebber, Inc.*, 16 F.Supp.2d 386, 392 (S.D.N.Y.1998) ("Under New York law, the minimum action necessary to sustain a claim of malicious prosecution is a request by a defendant that the authorities prosecute a plaintiff."); *Conway v. Smerling*, 37 Mass.App.Ct. 1, 635 N.E.2d 268, 271 (1994) (holding that defendants who repeatedly inquired into progress of criminal investigation had initiated or procured criminal proceedings for the purposes of a malicious prosecution claim); W. Page Keeton, et al., PROSSER & KEETON ON THE LAW OF TORTS § 119, at 873 (5th ed. 1984) (hereinafter PROSSER & KEETON).

{26} Viewed in the light most favorable to Jackson, the evidence of Weststar's participation in the criminal proceedings supports a finding that Weststar procured the prosecution of Jackson. When Lynch first met with Boutelle, Lynch indicated that Weststar hoped to avoid proceeding with a criminal complaint, but would do so if Jackson did not cooperate by repaying the money. Based on this testimony, the jury could reasonably conclude that Lynch intended that the decision to proceed with the criminal investigation be left to Weststar. This understanding was confirmed by Boutelle when he assured Lynch that he would not proceed with the investigation unless instructed to do so. The following day, Inman called Boutelle for the express purpose of asking Boutelle to commence the prosecution. When Inman made this phone call, the evidence shows that he knew that the prosecution would not proceed

without direction from Weststar. As Boutelle testified, "It is my understanding [that] Lori Lynch had called Gary [Inman], who is her supervisor, and relayed to him what my advice to her was, that I needed the authorization to keep going with this. And Gary, as the supervisor, called me back and he said, 'Yes, we do want to pursue this.'" Clearly, Weststar did more than merely provide information to the police. Under these facts, we cannot say as a matter of law that Weststar's desire to have the proceedings initiated was not the determining factor in Boutelle's decision to commence the prosecution. *Cf. Zamora*, 106 N.M. at 632–33, 747 P.2d at 927–28 (holding that defendants had not procured prosecution given district attorney's statement that "the decision [to prosecute] was made solely by the district attorney's office, without any encouragement, recommendation, direction, or pressure of any kind from the defendants"); *Hughes*, 44 N.M. at 537, 105 P.2d at 496 (finding no procurement where the record indicated that there was "no evidence to show that defendant himself initiated the action or that he advised or counselled (sic) with the District Attorney or any other person suggesting, even, that there should be a prosecution").

## C. Probable Cause

{27} Weststar argues that the trial court erred in not finding, as a matter of law, that Weststar had probable cause to believe that Jackson had committed a criminal offense. Weststar asserts that, in all cases, probable cause is an issue to be determined by the trial court and not the jury. We disagree that probable cause is necessarily an issue to be determined by a trial court and conclude that the evidence was sufficient to support a finding that Weststar lacked probable cause in this case.

{28} In *DeVaney*, the Court held that "the filing of a proper complaint with probable cause, and without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious motive." 1998–NMSC–001, ¶ 20, 124 N.M. 512, 953 P.2d 277. Probable cause is defined as "the reasonable belief, founded on known facts established

after a reasonable pre-filing investigation, that a claim can be established to the satisfaction of a court or jury." *Id.* ¶ 22 (citation & footnote omitted).

{29} If the facts surrounding the initiation of process are in dispute, the question of probable cause is properly left to the jury. *See id.* ¶ 41; *see also Stanley v. Webber,* 260 Va. 90, 531 S.E.2d 311, 314–15 (2000); *Brown v. Nationsbank Corp.,* 188 F.3d 579, 586 (5th Cir.1999); *Lee v. Southland Corp.,* 219 Va. 23, 244 S.E.2d 756, 758–59 (1978) (reversing trial court's determination of probable cause as a matter of law where evidence of plaintiff's intent in breaking door was disputed). In this case, the record indicates that the facts surrounding Inman's decision to request that Boutelle pursue criminal charges, and the inferences to be drawn from those facts, were in dispute. As such, it was up to the jury to weigh the evidence and resolve the conflicts.

{30} Weststar argues that probable cause was established as a matter of law based on the "undisputed" facts that Jackson knew the extra money wired into his account did not belong to him, purchased the CD to deny Weststar access to the money, and, for a period of time, refused to return the money when requested to do so. We disagree that the facts upon which Weststar relies were undisputed. More importantly, however, the critical question in determining the existence of probable cause is not what Jackson knew or intended, but whether Weststar had a reasonable belief, founded on known facts established after a reasonable pre-filing investigation, that Jackson had committed a criminal offense. *See DeVaney,* 1998–NMSC–001, ¶ 22, 124 N.M. 512, 953 P.2d 277. In evaluating Weststar's belief that Jackson had committed larceny, we look to the facts as they appeared at the time Inman directed Boutelle to pursue the prosecution.

{31} It is undisputed that Jackson was not responsible for the money being mistakenly deposited into his account. Although Jackson did not report the mistake to Weststar until after he was contacted by Lynch, he acknowledged that he was in possession of the money and initially indicated a willingness to return it to Weststar. When the CD matured in August, Jackson did not tell Weststar he would not return the money. Rather, he informed the company that he had retained counsel and directed Weststar to communicate with him through the attorney, as he apparently had been instructed to do by the attorney. Jackson's attorney then indicated that Jackson was seeking a way to keep the money, but that the attorney would respond to Weststar's demand letter.

{32} Inman's decision to prosecute Jackson for larceny was based on the letter sent to Weststar by Jackson's attorney. In this letter, the attorney indicated that Jackson had expended a portion of Weststar's money in reliance on Weststar's representations that the money had been properly wired into Jackson's account. The attorney acknowledged that Jackson did not have the entire balance demanded by Weststar, but offered $3,000 to settle the matter without civil action. In his closing, the attorney stated: "Please consider this offer as an attempt to settle this matter in an amicable and expeditious matter [sic]. If you have any questions, please do not hesitate to contact me." Based on these facts, the jury could have properly concluded that a reasonable person would not have believed that Jackson was guilty of a criminal offense.

{33} Weststar argues that, notwithstanding the foregoing, we should find that it had probable cause as a matter of law because Boutelle, the district attorney, the magistrate judge who issued the warrant for Jackson's arrest, and the committing magistrate all believed that probable cause existed. In some circumstances, reliance on the advice of a district attorney or a commitment by a magistrate may be enough to establish probable cause as a matter of law. *See* RESTATEMENT, *supra,* §§ 663, 666. Nonetheless, under the circumstances of this case, we conclude that a jury could find that the beliefs of the district attorney and the magistrate were based on incomplete knowledge of the material facts known to Weststar. "In determining what, if any, weight should be given to the commitment by a magistrate, the court should take into account evidence that the commitment ... was procured by

false testimony offered by the prosecutor or given in his behalf, or by his withholding of material evidence known to him." RESTATE-MENT, *supra*, § 663 cmt. h; *see also Chandler v. United States*, 875 F.Supp. 1250, 1269 (N.D.Tex.1994) (indicating that a complainant may be shielded from liability by the actions of a public prosecutor only if the complainant makes a full and fair disclosure of material facts known to the complainant).

{34} Boutelle's police report includes both incomplete and misleading statements of facts:

> Lori presented a copy of a Certified Letter sent to Ken Jackson after several phone calls to him could not get him to cooperate with correcting this mistake. Lori said Ken first denied any knowledge of receiving that much money, but later changed his story to "well I guess it was my lucky day, huh." Lori said Ken told her he did not have the money because it was tied up somewhere else, and he would work on trying to get it back to them sometime.

> . . . .

> Gary advised their attorney Tom Marek (Carlsbad) received a letter from Ken Jackson's attorney Mike Carrasco (Carlsbad) basically stating that Jackson would not be returning the misguided monies he received.... Gary said during contacts from Lori, Ken Jackson acknowledged that he knew what he was doing when he took that money out of his account so the bank could not reclaim it, but Ken would not tell Lori where the money is now hidden.

{35} Without a full disclosure of all material facts known by Weststar at the time it procured the prosecution of Jackson, we cannot say, as a matter of law, that Weststar had probable cause to initiate those proceedings. *See id.* at 1269–70 (concluding that complainant lacked probable cause due to complainant's failure to make a full and fair disclosure during grand jury proceedings).

#### D. Jackson's Guilt and Termination of Criminal Proceedings

{36} Weststar argues that Jackson's guilt and the fact the criminal proceedings did not terminate in Jackson's favor preclude a finding of malicious abuse of process. First, the *DeVaney* opinion explicitly rejects the requirement that a proceeding terminate in favor of the malicious-abuse-of-process plaintiff. 1998–NMSC–001, ¶ 23, 124 N.M. 512, 953 P.2d 277 ("[F]avorable termination is not an element of an action for malicious abuse of process...."). Second, we disagree that Jackson was guilty of larceny as a matter of law.

{37} To hold Jackson criminally liable for larceny, the State would bear the burden of proving beyond a reasonable doubt that Jackson "took and carried away" the money belonging to Weststar and that at the time of the taking, Jackson intended to permanently deprive Weststar of its money. *See* UJI 14–1601 NMRA 2001. " 'Carried away' means moving the property from the place where it was kept or placed by the owner." UJI 14–1603 NMRA 2001. "Generally one who innocently receives an overpayment of money by mistake is not guilty of larceny if, after discovering the mistake, he converts the excess moneys to his own use, but the rule is otherwise if he receives the overpayment knowingly with intent at the time of the overpayment to convert the excess." 52A C.J.S. *Larceny* § 29(c) (1968); *see also Cook v. State*, 196 Tenn. 104, 264 S.W.2d 571, 572 (1954) (stating that common law larceny includes situation in which defendant receives more money than was intended, defendant knows of the mistake at the time of delivery, and defendant intends to keep the money); *State v. Woll*, 35 Wash. App. 560, 668 P.2d 610, 613 (1983) (stating that common law larceny includes the wrongful appropriation of mistakenly delivered property if, upon receipt, the recipient knew that the property was mistakenly delivered and at that time formed the intent to keep it).

{38} Based on the evidence introduced at trial, a reasonable jury could conclude that Jackson was innocent of the crime of larceny. Whether Jackson ever intended to permanently deprive Weststar of its money was hotly disputed. Jackson testified that he removed the money from his bank account and purchased the CD to insure that he did

not mistakenly spend the money before Weststar asked him to return it. If a jury believed Jackson's testimony, it would necessarily acquit Jackson of larceny because Jackson lacked the intent to permanently deprive Weststar of its money at the time the money was "carried away" from the bank account and placed in the CD. *See* UJIs 14–1601, –1603. Similarly, if the State attempted to prove that Jackson committed larceny when he cashed the CD and deposited the money into a different account, Jackson could have raised the defense of good faith reliance on the advice of counsel. *See United States v. Butler*, 211 F.3d 826, 833 (4th Cir.2000) (describing elements of advice-of-counsel defense as (1) full disclosure of all material facts to the attorney and (2) good faith reliance on the attorney's advice); *United States v. Cross*, 113 F.Supp.2d 1253, 1262–63 (S.D.Ind.2000) (stating that advice-of-counsel defense applies to specific intent crimes and describing elements of defense). Under these circumstances, we reject Weststar's contention that Jackson was guilty of larceny as a matter of law.

### E. Misuse of Process

{39} Even if a complainant initiated proceedings with probable cause, the complainant may nonetheless be held liable for malicious abuse of process if the evidence shows that the complainant misused the process "through some irregularity or impropriety suggesting extortion, delay, or harassment[.]" *DeVaney*, 1998–NMSC–001, ¶ 28, 124 N.M. 512, 953 P.2d 277. The act giving rise to liability for misuse of process need not be improper per se. *See id.* ¶ 48. Instead, a factfinder must evaluate the act or acts in context and in light of the surrounding circumstances to determine whether they were improper. *See id.* ¶¶ 49–50.

{40} " '[A] demand for collateral advantage that occurs before the issuance of process may be actionable, so long as process does in fact issue at the defendant's behest, and as part of the attempted extortion.' " *Id.* ¶ 20 (quoting PROSSER & KEETON, *supra*, § 121, at 898). It is well established that an action for malicious abuse of process may arise out of the use of a criminal prosecution

for the purpose of debt collection. *See generally* Annotation, *Use of Criminal Process to Collect Debt as Abuse of Process*, 27 A.L.R.3d 1202, 1205–06 (1969). "[I]t has been held to be an improper use of criminal process for the creditor, or an officer of the law acting in concert with the creditor, to demand payment of a debt as a condition of the debtor's avoiding arrest, or further confinement, or further proceedings in a criminal prosecution." *Palmer Ford, Inc. v. Wood*, 298 Md. 484, 471 A.2d 297, 311 (1984).

{41} After sending Jackson a demand letter threatening legal action, Weststar contacted Boutelle to investigate the possibility of prosecuting Jackson. In this meeting, Lynch explained to Boutelle that Weststar hoped to avoid criminal action, but could only do so if Jackson repaid the money. Boutelle then called Jackson's attorney while Lynch was still in the room, and he conveyed Weststar's message that the only way for Jackson to avoid criminal prosecution was to resolve the dispute with Weststar. "There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." PROSSER AND KEETON, *supra*, at 898. Given the facts of this case, a reasonable jury could conclude that Boutelle was acting on behalf of Weststar and therefore Weststar should be charged with Boutelle's action. Contrary to Weststar's argument that it could not be charged with Boutelle's action unless there was a formal, legal, agency relationship, we believe that the elements of the tort, particularly those discussed above in the "Initiation or Procurement" section of this opinion, permit Weststar to be charged with all conduct it initiated or procured. We conclude that the evidence was sufficient to support a finding that Weststar used the criminal prosecution of Jackson to compel Jackson to return the money owed to Weststar.

### F. Primary Improper Motive

{42} "Under the requirement of a primary improper motive, it is insufficient that the malicious-abuse-of-process defendant acted with ill will or spite. There must be a purpose to accomplish an illegitimate

end." *DeVaney,* 1998–NMSC–001, ¶ 29, 124 N.M. 512, 953 P.2d 277 (internal citations omitted). In the context of a criminal prosecution, an improper motive may be proven with evidence that the prosecution was "initiated primarily for a purpose other than that of bringing an offender to justice." *Zamora,* 106 N.M. at 632, 747 P.2d at 927. The Restatement makes it clear that using the criminal process to compel another to pay a debt, even if the debt is owed, constitutes a misuse of process:

> Since the only proper purpose for which criminal proceedings can be initiated is that of bringing an offender to justice and thereby aiding in the enforcement of the criminal law, it follows that one who initiates the proceedings to force the accused to pay money or to turn over land or chattels to the accuser, does not act for a proper purpose. This is true although the money is lawfully owed to the accuser or the thing in question has been unlawfully withheld or taken from him, so that relief, might have been secured in appropriate civil proceedings.

RESTATEMENT, *supra,* § 668 cmt. g.

■ {43} In this case, it is unnecessary for us to infer an improper motive because Jackson presented direct evidence that Weststar initiated the criminal proceedings to collect the money from Jackson and not for the purpose of bringing Jackson to justice. When Lynch met with Boutelle she admitted that Weststar just wanted its money back and would prefer to avoid a criminal trial. Boutelle also testified that he understood that Weststar would have and could have dropped the criminal charges had Jackson repaid the money. While we agree with Weststar that it was reasonable and legitimate for it to seek the return of its money, the criminal process was not a proper avenue for it to seek this result. *See* RESTATEMENT, *supra,* § 668 cmt. d (including as an improper purpose "when the proceedings are initiated for the purpose of obtaining a private advantage even though the advantage might legitimately have been obtained in civil proceedings"). We conclude that substantial evidence supports the jury's finding that Weststar acted with an improper motive.

## II. Jury Instructions

{44} Weststar challenges the validity of the jury instructions on several grounds. In particular, Weststar argues that (1) the jury should not have been instructed on elements of malicious abuse of process because the evidence was insufficient to support the claim; (2) the instructions improperly left the determination of probable cause to the jury rather than to the court; and (3) the trial court erred in failing to instruct the jury as to the meaning of "initiated or procured criminal proceedings," "probable cause," and "extortion."

■ {45} We have already disposed of Weststar's first two points of error. We decline to reach Weststar's third point of error because Weststar failed to preserve the issue. *See Baxter v. Gannaway,* 113 N.M. 45, 50, 822 P.2d 1128, 1133 (Ct.App.1991). Weststar concedes that it failed to preserve the issue, but urges us to nonetheless consider the issue because the "trial court had an independent duty to define legal terms and terms of art used in its instructions." We reject this argument. The cases cited by Weststar to support its contention that failure to instruct on legal terms is an exception to the general requirements of preservation do not support Weststar's position. In all of these cases, the appellant had requested that the trial court provide definitional instructions and the trial court had refused to do so. *See, e.g., Epperly v. Johnson,* 734 N.E.2d 1066, 1074 (Ind.Ct.App.2000) ("It is generally error for a trial court to refuse to define in its instructions technical and legal phrases relevant to material issues of a lawsuit if it is properly requested to do so.") (internal quotation marks, citation, and emphasis omitted). Even in criminal cases in which the trial court's duty to instruct is arguably more important, it is not reversible error for a trial court to fail to give definitional instructions unless they are requested. *See State v. Tarango,* 105 N.M. 592, 599, 734 P.2d 1275, 1282 (Ct.App.1987), *overruled on other grounds by Zurla v. State,* 109 N.M. 640, 645, 789 P.2d 588, 593 (1990). Because Weststar neither tendered instructions defining the terms at issue nor requested that the trial court pro-

vide such definitions, we will not consider Weststar's argument on appeal. *See Bassett v. Bassett,* 110 N.M. 559, 563, 798 P.2d 160, 164 (1990).

### III. Punitive Damages

{46} Weststar contends that, even if the evidence was sufficient to find it liable for malicious abuse of process, the evidence was insufficient to sustain the jury's award of punitive damages. We disagree.

{47} An award of punitive damages may be sustained on appeal only if the evidence shows a culpable state of mind. *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.,* 1999–NMSC–006, ¶ 53, 127 N.M. 1, 976 P.2d 1. We require "the presence of aggravated conduct beyond that necessary to establish the basic cause of action in order to impose punitive damages." *Teague–Strebeck Motors, Inc. v. Chrysler Ins. Co.,* 1999–NMCA–109, ¶ 78, 127 N.M. 603, 985 P.2d 1183 (order on motion for rehearing). Punitive damages may be awarded only when the evidence shows that the wrongdoer's conduct was malicious, willful, reckless, wanton, fraudulent, or in bad faith. *See* UJI 13–1827 NMRA 2001. In this case, the jury was instructed that it must find that Weststar acted maliciously, willfully, recklessly, or wantonly before it could award punitive damages to Jackson. "Willful conduct is the intentional doing of an act with knowledge that harm may result." *Id.* "Recklessness requires indifference to the rights of the victim, rather than knowledge that the conduct will violate those rights." *Kennedy v. Dexter Consol. Schs.,* 2000–NMSC–025, ¶ 32, 129 N.M. 436, 10 P.3d 115.

{48} The financial and emotional costs of wrongfully being the subject of criminal proceedings are obvious. Viewed in the light most favorable to the award, the evidence shows that Weststar acted with utter indifference to Jackson's right to be free from such a needless intrusion. In meeting with Boutelle, Weststar, at the very least, portrayed the facts known to it in the light most unfavorable to Jackson, and, at worst, misrepresented those facts. Weststar knew that Jackson's belief that he might be entitled to keep part of the money was based on the advice of an attorney, and the evidence shows that Weststar's decision to prosecute Jackson was based on its fear that Jackson and his attorney would defend against a civil action. By misusing the criminal process to gain an advantage in its negotiations for the return of the money, Weststar acted with a sufficiently culpable state of mind to warrant an award of punitive damages.

{49} Weststar also raises a general challenge to the amount of the punitive damages award. In determining whether a damages award is excessive, we do not re-weigh the evidence, but instead determine whether the award is excessive as a matter of law. *Coates v. Wal–Mart Stores, Inc.,* 1999–NMSC–013, ¶ 49, 127 N.M. 47, 976 P.2d 999. On appeal, Weststar bears the burden of showing that the award was infected with " 'passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive.' " *Id.* ¶ 51 (quoting *Allsup's Convenience Stores, Inc.,* 1999–NMSC–006, ¶ 19, 127 N.M. 1, 976 P.2d 1). As we discussed above, Weststar's belief in Jackson's guilt was unreasonable given that Jackson never refused to return the money and was in the midst of negotiating with Weststar when it decided to procure the criminal prosecution. As a result of Weststar's actions, Jackson was arrested twice and suffered stress in his marriage. Under these circumstances, we cannot say that the award is " 'so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice.' " *Id.* ¶ 53 (quoting *Chavez–Rey v. Miller,* 99 N.M. 377, 379, 658 P.2d 452, 454 (Ct.App.1982)). Because Weststar has presented nothing to demonstrate that the jury was somehow corrupted or unduly influenced, we conclude that the award is not excessive as a matter of law.

### III. Post–Judgment Interest

{50} Jackson appeals the trial court's refusal to award post-judgment interest on the punitive damages portion of his award. Weststar recognizes that Jackson asserted his right to post-judgment interest below, but argues that Jackson has changed the basis of

his claim on appeal and urges us not to consider his appeal for this reason. Weststar asserts that Jackson's argument below was essentially that post-judgment interest is different from pre-judgment interest and therefore that *Weidler v. Big J Enterprises, Inc.*, 1998–NMCA–021, ¶ 55, 124 N.M. 591, 953 P.2d 1089, in which we held that pre-judgment interest could not be awarded on punitive damages, was not controlling on the issue of post-judgment interest. On appeal, Jackson argues that post-judgment interest is mandatory under Section 56–8–4(A). The fact that pre-judgment interest is discretionary while post-judgment interest is mandatory is one of the major differences between the two forms of interest. Because Jackson's cross-appeal raises a purely legal issue and requires us to analyze the post-judgment interest statute in light of the *Weidler* opinion, we conclude that the issue was properly preserved and will reach it on the merits. To do otherwise would require an overly technical application of the rules of preservation. *See Garcia ex rel. Garcia v. La Farge*, 119 N.M. 532, 540–41, 893 P.2d 428, 436–37 (1995).

{51} Weststar makes two arguments in support of the trial court's denial of post-judgment interest on the punitive damages award. First, Weststar argues that post-judgment interest does not apply to punitive damages as a matter of law under our decision in *Weidler*. Second, if post-judgment interest is held to apply to punitive damages, Weststar argues that the award of interest is within the discretion of the trial court and the court did not abuse its discretion in this case. We reject both contentions and conclude that the trial court erred in denying post-judgment interest on the punitive damages award.

### A. *Weidler v. Big J Enterprises*

{52} In *Weidler*, we held that pre-judgment interest does not apply to awards of punitive damages for two reasons. First, we noted that while pre-judgment interest serves to prevent undue delay and to compensate a plaintiff for the deprivation of just compensation for the wrong suffered, punitive damages serve to punish a defendant for prior bad acts and to deter the defendant

from such acts in the future. 1998–NMCA–021, ¶¶ 52–53, 124 N.M. 591, 953 P.2d 1089. Because punitive damages are a "windfall conferred upon an otherwise fully compensated plaintiff" and are a penalty to be determined by the jury, we concluded that "[a]dding pre-judgment interest to a punitive damages award would change what the jury determined to be appropriate punishment and, thus, undermine the principles of punitive damages." *Id.* ¶ 53. Second, we noted that the compensatory purpose of pre-judgment interest is at odds with punitive damages, insofar as a plaintiff is not entitled to punitive damages. *See id.* ¶ 54.

{53} By contrast, the purpose of post-judgment interest is to compensate the prevailing party for the deprivation of its judgment money and to discourage parties from pursuing meritless appeals. *See, e.g., Brinn v. Tidewater Transp. Dist. Comm'n*, 113 F.Supp.2d 935, 938 (E.D.Va.2000). As such, the rationale behind this Court's denial of pre-judgment interest on punitive damages does not have much force. Once judgment has been entered on a verdict awarding punitive damages, the plaintiff becomes entitled to the punitive damages award to the same extent as the plaintiff is entitled to compensatory damages. Awarding post-judgment interest on the full award, therefore, compensates the plaintiff for the deprivation of money owed and encourages the defendant to expeditiously pay the judgment debt. We conclude that once a punitive damages award has been incorporated into a judgment, it becomes a judgment for the payment of money and the award of post-judgment interest is mandatory. *See Sunwest Bank v. Colucci*, 117 N.M. 373, 379, 872 P.2d 346, 352 (1994); *Bustos v. Bustos*, 2000–NMCA–040, ¶¶ 20–21, 128 N.M. 842, 999 P.2d 1074; *but see Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶ 38, 129 N.M. 586, 11 P.3d 550

### B. Post–Judgment Interest Mandatory Under Section 56–8–4(A)

{54} Weststar cites to *Gonzales*, in support of its argument that an award of post-judgment interest is within the discretion of the trial court. We disagree that *Gonzales*

stands for this proposition. The issue before the Supreme Court in *Gonzales* was whether a section of the Human Rights Act, NMSA 1978, § 28–1–13(D) (1969, as amended through 1987, prior to 1991, 1993, 1995, and 2000 amendments) was a statutory exception to the general rule that the state is exempt from an award of pre- or post-judgment interest under Section 56–8–4. *See Gonzales,* 2000–NMSC–029, ¶ 37, 129 N.M. 586, 11 P.3d 550. In reaching the conclusion that the Human Rights Act does not create such an exception, the Supreme Court noted that "an interest award under Section 56–8–4 is not an absolute right, but rather is a matter to be left to the discretion of the trial court." *Id.* ¶ 38. However, the basis for the Court's holding was that Section 28–1–13(D) does not list judgment interest as an award for which "the state shall be liable the same as a private person." *Id.* ¶ 38. Because Section 28–1–13(D) does not explicitly conflict with Section 56–8–4(A), and the plaintiff in *Gonzales* offered no authority for her assertion that the legislature intended to include judgment interest as an award allowed under Section 28–1–13(D), the Court held that it would not expand Section 28–1–13(D) to allow such interest. *Id.* ¶ 38. As such, the Court's general statement regarding the discretionary nature of Section 56–8–4 was not necessary to reach its conclusion, is therefore · dicta, and is not binding on this Court except in cases like *Gonzales* involving Section 28–1–13(D). *See Ruggles v. Ruggles,* 116 N.M. 52, 59–60 n. 8, 860 P.2d 182, 189–90 n. 8 (1993).

{55} Our conclusion is supported by the facts that the seminal case of *Sunwest Bank* was not cited and that the cases on which the Supreme Court relied were cases dealing with interest as an element of damages under NMSA 1953, § 50–6–3 (Repl.1962), now NMSA 1978, § 56–8–3 (1983), and not Section 56–8–4(A). *See Kennedy v. Moutray,* 91 N.M. 205, 206, 572 P.2d 933, 934 (1977); *Trujillo v. Beaty Elec. Co.,* 91 N.M. 533, 538, 577 P.2d 431, 436 (Ct.App.1978). Prior to 1983, the award of interest was left to the discretion of the trial court, and the statutes merely set the interest rates applicable to various causes of action and judgments. *See* § 50–6–3, NMSA 1953, § 50–6–4 (Repl.1962),

now § 56–8–4. In 1983, however, the law was amended such that the award of prejudgment interest under Sections 56–8–3 and 56–8–4(B) remained within the discretion of the trial court, but post-judgment interest under Section 56–8–4(A) became mandatory. *See* 1983 N.M. Laws, ch. 254, §§ 1–2. As such, although *Kennedy* and *Trujillo* remain good law with respect to awards of prejudgment interest under Sections 56–8–3 and 56–8–4(B), they are inapplicable to Section 56–8–4(A). *See Sunwest Bank,* 117 N.M. at 377–79, 872 P.2d at 350–52 (extensively discussing the distinctions between interest awards under Sections 56–8–3, 56–8–4(A), and 56–8–4(B) and holding interest under Section 56–8–4(A) to be mandatory).

## CONCLUSION

{56} For the foregoing reasons, we affirm the judgment against Weststar and the awards of compensatory and punitive damages to Jackson. We reverse the trial court on its failure to award post-judgment interest on the punitive damages award and remand for further proceedings consistent with this opinion.

{57} **IT IS SO ORDERED.**

I CONCUR: IRA ROBINSON, Judge.

JONATHAN B. SUTIN, Judge (dissenting in part and concurring in part).

SUTIN, Judge (dissenting in part and concurring in part).

{58} I respectfully dissent with regard to the majority's holding that the issues of whether Weststar initiated or procured Jackson's criminal prosecution and whether Weststar's primary motive was to obtain the return of money through the criminal process were properly submitted to the jury. Because I would reverse on these issues, I do not address the punitive damages issue.

{59} Court scrutiny of malicious abuse of process actions is more demanding than that required in garden variety tort actions. We should carefully adhere to the watchwords of our precedent. The tort of malicious abuse of process is disfavored in the law and is to be "favored only in plain, compelling cases." *Zamora v. Creamland Dairies, Inc.,* 106

N.M. 628, 634, 747 P.2d 923, 929 (Ct.App. 1987). These actions " 'ought not to be favored, but managed with great caution.' " *Hughes v. Van Bruggen*, 44 N.M. 534, 540, 105 P.2d 494, 498 (1940) (quoting Lord Holt). The claimant has a heavy burden in establishing his claim. *Zamora*, 106 N.M. at 634, 747 P.2d at 929.

{60} Citizens are to have "wide latitude in reporting facts to authorities so as not to discourage the exposure of crime." *Id.* The tort is to be narrowly construed in order to protect the right of "access to the courts." *DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC–001, ¶ 19, 124 N.M. 512, 953 P.2d 277. This right must include the right to report facts to law enforcement officials and to engage in a discussion with those officials of how the officials intend to proceed based on the facts reported. That discussion might center on the need for further investigation. It might include the officials extending to the victim an option to say whether the victim wanted the officer to continue.

{61} This case is a hybrid. It lies somewhere between crime and debt. It is closer to crime than to debt. While cases dealing with debt collection might be instructive, along with cases dealing with outright crime, they are not controlling. This is the odd, in-between case. Jackson's conduct is neither breach of obligation nor, at least arguably, criminal. The conduct borders more on the side of crime than debt because Jackson made a decision not to return the full amount of the money while neither stating nor having any lawful basis whatsoever, not even an arguable one, on which to hold on to the money.

### I. Initiation or Procurement

{62} Appropriate scrutiny in this appeal requires a conclusion that insufficient evidence exists from which a jury could determine, even based on reasonable inferences, that Weststar initiated or procured the criminal prosecution thereby giving rise to tort liability under malicious abuse of process. I therefore respectfully disagree with the majority's conclusion that the evidence was sufficient to support a finding that the decision to prosecute Jackson was made at the request and insistence of Weststar. Majority Opinion ¶ 19. This conclusion is drawn from erroneous premises and insufficient factual bases.

{63} The erroneous premises are (1) a factual dispute existed as to whether Weststar provided information to Officer Boutelle that it reasonably believed to be true; (2) Officer Boutelle's investigation was not an independent one; (3) Weststar participated in the proceedings; and, perhaps (4) Weststar did not have probable cause to believe Jackson was guilty of a criminal offense. The factual bases are insufficient, in that Jackson failed to meet his heavy burden of proof to show something more for initiation or procurement of Jackson's prosecution than Weststar's selection of Boutelle's offered option to say it wanted Boutelle to proceed in the case. I discuss these faults in more detail.

### A. Weststar's Reasonable Belief

{64} I respectfully disagree with the majority's conclusion that a factual dispute existed as to whether Weststar provided information to Boutelle that it believed to be true. Majority Opinion ¶ 23. This was not a legal issue in this case. Even were it an issue, it cannot be disputed that Weststar reasonably believed the information it gave to the police was true.

{65} Jackson first told Weststar he would return the money. After he received bad advice from a lawyer, he did an about-face and told Weststar to "talk to my lawyer." In the context of Weststar wanting the money returned, the lawyer, who was Jackson's agent, answered by telling Weststar this was Jackson's "golden opportunity." Weststar, reading this loud and clear, decided to report the circumstances to law enforcement officials. Weststar provided information to the officials that it reasonably believed to be true. No evidence exists that Weststar did not reasonably believe the information it provided was accurate. Significantly, the jury was not asked to consider evidence to the contrary. This was never a jury issue. Jackson did not argue below or on appeal to the contrary.

{66} Furthermore, it is not disputed that Weststar reasonably believed Jackson was acting wrongfully. Boutelle gave Weststar the option to call off any further activity if Weststar was able to obtain the money through discussion with Jackson. Offering that option was the officer's call, not Weststar's. Two significant events occurred. Weststar was present when Jackson's lawyer laughed at Boutelle in response to Boutelle's suggestion that the matter might be settled by paying the money back. Then Weststar received a letter that can reasonably be read, if not only be read, to say that Jackson had no intent to pay all the money back—at least not without further pressure to do so—extortive conduct under the circumstances where the lawyer, acting as Jackson's agent, knew or must be held to have known this position lacked any legal basis. A reasonable person would believe Jackson acted wrongfully and unlawfully. Weststar told Boutelle it wanted to proceed. Significantly, Weststar's belief that Jackson acted wrongfully was not a legal or a factual issue in this case.

{67} Even looking at the facts in a light most favorable to Jackson, there can be no question that (1) Weststar provided information to Boutelle that Weststar reasonably believed to be true, and (2) at the time Weststar told Boutelle that it wanted to proceed, Weststar reasonably believed it was not going to receive all the money, and neither Jackson nor Jackson's lawyer had given any reason whatsoever to Weststar or Boutelle to justify not returning the money, other than this was Jackson's "golden opportunity."

## B. Officer Boutelle's Independent Investigation

{68} I respectfully disagree with the majority's conclusion that there was a "lack of independent investigation." Majority Opinion ¶¶ 23, 24. First of all, and once again, whether Boutelle's investigation was independent was never a legal or factual issue. It was not argued below or on appeal. It was not before the jury. Secondly, it cannot be disputed that Boutelle conducted an independent investigation. No evidence supports a conclusion it was insufficient or that it lacked independence. The investigation was sufficient and it was sufficiently independent as a matter of law.

{69} All of the evidence could come only from Weststar, Jackson (including his wife and his lawyer), and Norwest. Boutelle received information and statements from people at Weststar, and was also given documents and facts, that showed, unquestionably, that Jackson received, and then, without stating any justification to either Boutelle or Weststar for doing so, held, continued to hold, and did not return upon request, money that was not his. Boutelle, who was Jackson's witness, testified he "collected all the information [he] could gather." Boutelle had also spoken in separate conversations directly with Jackson and with Jackson's lawyer. Boutelle believed he had sufficient evidence to take the matter to the district attorney and to file a complaint. He never testified to any skepticism on his part about the accuracy of the evidence or about Jackson's culpability. That Boutelle did not have Norwest documents at the time the district attorney approved the complaint and proceeded is immaterial.

{70} *Zamora*, discussed by the majority, Majority Opinion ¶ 24, is a different case. The amount of investigation in *Zamora* is not a basis on which to say the investigation in the present case was insufficient or not independent. What is required under *Zamora* is a fair disclosure to law enforcement authorities. *Id.* at 634–35, 747 P.2d at 929–30 (precluding liability where citizen gives honest, even if mistaken, information about crime). That occurred here. " 'There can be no liability where the prosecuting officer relies upon his own investigation and upon information furnished by others than defendant or where defendant has himself fairly disclosed, and it is left to the officer's own discretion, judgment and responsibility as to whether there shall be a prosecution.' " *Id.* at 632, 747 P.2d at 927 (quoting *Hughes*, 44 N.M. at 540, 105 P.2d at 498).

## C. Weststar Did Not Participate in the Proceedings

{71} I respectfully disagree with the majority's view that Weststar participated in the

criminal proceeding thereby supporting a finding that Weststar procured the prosecution of Jackson. Majority Opinion ¶ 26. Boutelle thought a crime had been committed. He is a law enforcement officer. He knew and told Weststar at least twice that the office of the police was not a collection agency. At the point Weststar said it wanted to proceed with the criminal case, no complaint had been filed. Weststar then did nothing more except what may have been required by law enforcement authorities. Any "participation" (¶ 26) could only have been cooperation by providing documents to Boutelle and testifying at the preliminary hearing.

{72} No evidence exists that Weststar filed a civil action knowing Jackson had been arrested or tracking what the officials were doing, or that Weststar was checking in with the authorities or encouraging or pressuring them in any way. The evidence in the case is to the contrary. Furthermore, the district attorney acted independently in approving Boutelle's complaint, and in moving the matter through two magistrate judge proceedings, one to obtain ·an arrest warrant, the other to bind Jackson over after a preliminary hearing. Weststar did nothing to pursue, to procure, or to cause an arrest or prosecution beyond acting upon Boutelle's option and telling him it wanted the authorities to proceed with the criminal case.

{73} That an officer gives a citizen the option to ask that the criminal proceeding go forward or not does not create a jury issue as to initiation or procurement simply because the citizen says "go forward." It is the responsibility of the law enforcement officer and district attorney to investigate or not and to prosecute or not. It is the responsibility of the officer or district attorney to explain, as Boutelle did, that the police and district attorney are not collection agencies, and that the authorities do not want to prosecute certain cases unless the citizen wants it done and will cooperate. But that is just the first step. Even if the citizen wants to proceed, it nevertheless remains the responsibility of the officer and district attorney to explain that even if the citizen wants to prosecute, the officer or district attorney can and

will make independent decisions whether to go forward and how far to proceed. Boutelle and the district attorney each made separate independent decisions to proceed. Something more is required in this case for procurement than Weststar's selection of the option to proceed given by the officer. With this evidence alone, Jackson failed to meet his "heavy burden" of proof. *See Zamora,* 106 N.M. at 634, 747 P.2d at 929.

{74} Under circumstances such as this case presents, where it is a close question whether a person has committed a crime, surely we must rely on the authorities, not the citizen-victim, to carefully and properly interpret criminal laws and apply those laws to the facts. Where the authorities err, the courts must step in to correct the error. Where the citizen-victim errs by acting with malice and derailing the independence of the decision-making by authorities, the law of torts may properly be applied as a corrective measure.

### D. The Majority's Cases

{75} The majority cites two out-of-state cases to support its conclusion that sufficient evidence existed to find initiation or procurement of Jackson's prosecution, namely, *Kurschus v. PaineWebber, Inc.,* 16 F.Supp.2d 386 (S.D.N.Y.1998), and *Conway v. Smerling,* 37 Mass.App.Ct. 1, 635 N.E.2d 268 (1994). Majority Opinion ¶ 25.

{76} *Kurschus* is a trial court decision denying summary judgment to a defendant on a malicious prosecution claim. 16 F.Supp.2d at 394. The trial court determined issues of fact existed as to whether the defendant played a role in the initiation of criminal proceedings. *Id.* at 392–93. That initiation consisted at a minimum of the defendant's wife having filed a complaint with the police and having specifically requested that the police arrest the plaintiff. *Id.* at 392.

{77} *Conway* is another malicious prosecution case. An employer mentioned to a police officer a concern that a departed employee had wrongfully "diverted inventory and sold it for her own account." 635 N.E.2d at 270. An investigation ensued, and a detective who did not comprehend the underlying

transactional circumstances decided, "because of continuing inquiry by the [employer] about the progress of the investigation," to "apply to a clerk-magistrate for a criminal complaint . . . and 'let the clerk decide it.'" *Id.* at 271. The court stated: "Although the evidence suggests that the [employer] did no more than inquire about the progress of an investigation, taking that evidence most favorably to the plaintiff, it could be said that they were the instrument of the complaint." *Id.*

{78} *Conway* required, for malicious prosecution, that "the citizen presses the police to apply for a complaint." *Id.* Yet *Conway* stated, "[i]f a citizen registers with the police an apprehension that a crime has been committed and leaves the matter to the judgment and responsibility of the public officers, that citizen, though having started the chain of events that led to legal process, cannot be charged with malicious prosecution." *Id.* The jury's verdict in *Conway* was for the plaintiff. *Id.* at 270. The trial court granted the defendant's judgment notwithstanding the verdict, and the court of appeals affirmed on the ground of lack of evidence of malice: No evidence was adduced that the defendants, in mentioning the matter to the police and continuing to inquire about the progress of the investigation, "had a purpose other than bringing suspected thieves to justice." *Id.* at 270, 272.

{79} *Conway's* ultimate result was correct. Insufficient evidence existed for a jury determination on the issue of the improper motive or malice. I do not agree, however, with the *Conway* determination that whether the employer was "the instrument of the complaint" was for the jury in that case. Further, I do not agree that *Conway* paves the way for our Court, in the present case, to hold Weststar liable for providing information to the police and accepting Boutelle's offer of the option to withhold a stated desire that the case proceed pending attempts to obtain the return of money wrongfully held.

{80} The case before us is different from these out-of-state cases. A citizen does not initiate or procure a criminal prosecution where, as here, the citizen goes to the police with a complaint and sets out the circum-

stances of a person receiving mis-directed money and refusing to return it. The officer personally corroborates the circumstances. The officer explains the procedures and requirements and asks the citizen if the citizen is "willing to cooperate with everything we ask you to do and continue fully with the prosecution." In the conversation, the citizen says "[w]e are hoping to resolve this before anything has to go further." "We are hoping to get cooperation, and can get this resolved where we can just close the whole matter out and go on from there." It appears to the officer a crime may have been committed, but the officer tells the citizen he must first check it out with the district attorney. The officer says to the citizen: You (citizen) need to know law enforcement authorities are not debt collectors. You (citizen) say you are interested in getting your money back, and if you get it back, you are not interested in whether or not I continue. You (citizen) tell me that you will let me know. I (officer) won't proceed until you tell me that you (citizen) want to proceed. After reasonably believing that it was not going to get the money back, based on circumstances indicating no intent on the part of the person holding the money to return it, the citizen tells the officer it wants the officer to proceed. Thereafter, except perhaps to deliver further documentation or statements regarding the circumstances, the citizen does nothing, and has no involvement with the officer or the district attorney until required to testify at a preliminary hearing. The ultimate, final decisions whether to file a complaint, arrest, and prosecute are made by the police officer and the district attorney.

{81} *Kurschus* and *Conway* fall short when placed in the same ballpark with our own cases, *Hughes*, 44 N.M. at 541, 105 P.2d at 498–99, and *Johnson v. Weast*, 1997–NMCA–066, ¶ 20, 123 N.M. 470, 943 P.2d 117. *Hughes* and *Johnson* support reversal and should be followed.

{82} In *Johnson*, the Court analyzed whether the actions of the defendant, a drug inspector for the New Mexico Board of Pharmacy, constituted the initiation of criminal proceedings against the plaintiff. At the request of an assistant district attorney, the

defendant submitted an investigative report regarding the plaintiff. The report was used as the basis for grand jury proceedings. *Id.* ¶ 17. The fact the report stated "Complaint against Bill Johnson" as part of the printed Pharmacy Board form was determined by this Court not to rise to the level of a criminal complaint under the rules of criminal procedure. *Id.* One significant aspect of *Johnson* is this Court's determination that the defendant's report was "simply gathering information which may lead to probable cause, a determination to be made by someone else, such as the police, the prosecutor, or the grand jury." *Id.* ¶ 13. Yet, in *Johnson,* the defendant gathered information regarding the plaintiff's issuing forged prescriptions, "took this information to [the] Assistant District Attorney," proceeded then at the assistant district attorney's request to conduct further investigation and to provide a written report, and wrote in the report that the plaintiff was "a target of an investigation" and concluded in the report that "the case remain 'open pending further investigation.'" *Id.* ¶¶ 2, 3. The assistant district attorney used the report to obtain an indictment against the plaintiff and to arrest him, and the defendant then testified against the plaintiff at the criminal trial. *Id.* The charges against the plaintiff were later dismissed when evidence was suppressed. *Id.* ¶ 4.

{83} The defendant in *Johnson* appears to have gone beyond anything Weststar did in the case before us. Yet no evidence existed that "the [assistant district attorney] was influenced or pressured by [the][d]efendant ... into bringing an indictment." *Id.* ¶ 20. The defendant's initiation of the process, by taking information to the assistant district attorney, and continuation of the investigation at the assistant district attorney's request, "[did] not initiate proceedings so as to give rise to a malicious prosecution claim, [where] the decision to proceed [was] left to the discretion of ... the prosecutor and the absence of falsity allows the prosecutor to exercise independent judgment." *Id.* I respectfully submit we should take our cue from *Johnson,* not from *Kurschus* and *Conway.*

{84} In *Hughes,* a malicious prosecution action, the defendant, a victim of theft, gave information to the officers regarding the plaintiff and signed a criminal complaint against the plaintiff at the request of law enforcement officers. The New Mexico Supreme Court held the defendant did not initiate the criminal proceeding, because "'[t]he exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.'" *Id.* at 538, 105 P.2d at 497 (quoting Restatement of the Law of Torts, § 653(g)). It was of no concern to the Court that a defendant "sign[ed] the complaint which puts in motion the prosecution." *Id.* at 539, 541, 105 P.2d at 497, 499.

{85} The court in *Hughes* looked at all inferences to be reasonably drawn from the facts in support of the plaintiff's claim, and then proceeded to reverse the verdict for the plaintiff, holding the trial court erred in overruling the defendant's motion for a directed verdict. *Id.* at 537, 542, 105 P.2d at 496, 499. *Hughes* is important not only for its holding but for its statements of policy and law.

If we are to have prosecutions of law violations only at the very great hazard of unreasonably subjecting the complaining witness to the expensive ordeal and uncertain results of suits for damages if convictions not be obtained, we then approve a rule which thwarts justice upon the very threshold of its entrance. Few men would take the chance and invite such a suit, even though they would otherwise be boldened to advocate and uphold law and order. Their attitude could very properly be, 'let the other fellow do it.' The policy of the law is not, as it should not be, unreasonably to deter those who know of breaches of the law from complaining against the offenders.

....

"This kind of suit, by which the complainant in a criminal prosecution is made liable to an action for damages, at the suit of the person complained of, is not to be favored; it has a tendency to deter men who know of breaches of the law, from prosecuting offenders, thereby

endangering the order and peace of the community."

The policy of the law in this respect has not changed through the centuries. We have like expressions and find like support for such a policy in the cases down through the years and to the very present time. *Id.* at 540–41, 105 P.2d at 498 (quoting *Cloon v. Gerry,* 79 Mass. 201 (1859)). I respectfully submit we should follow *Hughes,* not *Kurschus* and *Conway.*

### E.  Non–Issues

{86} Weststar raises, and the majority therefore discusses, what in my mind are non-issues. The arguments stem from *DeVaney.* One is probable cause. The second is the manner in which the criminal proceedings were terminated. The third relates to an aspect of misuse of process. These issues have no applicability or bearing on this case or its outcome.

### 1.  Probable Cause (Majority Opinion ¶¶ 27–35)

{87} Weststar argues probable cause because *DeVaney* discusses it. The trial court instructed on it, although it should be noted that the trial court did not state what probable cause was required. Weststar argues, and the majority reiterates, a requirement of probable cause to believe Jackson was guilty of a criminal offense. Majority Opinion ¶¶ 27, 30, 32. Probable cause to believe Jackson was guilty of a criminal offense is a false issue in this case, and needs little, if any discussion.

{88} *DeVaney* is an important guideline for our new tort of malicious abuse of process, but certain statements in *DeVaney* should be limited to *DeVaney* circumstances, and the "probable cause" issue and discussion in *DeVaney* is one of those. *DeVaney* involved an underlying civil action, not a citizen-victim seeking access to law enforcement authorities. Citizens who go to the police to report facts are not required to develop a belief that amounts to probable cause that a crime has been committed. They need only fairly report (disclose) the facts. *Hughes,* 44 N.M. at 541, 105 P.2d at 499; *Zamora,* 106 N.M. at 632, 747 P.2d at

927. It is up to law enforcement officers and district attorneys to proceed if they determine a crime has been committed.

{89} Furthermore, even under *DeVaney's* analysis, a procedural impropriety, as opposed to lack of probable cause, may be shown as a means of demonstrating *DeVaney's* second, or misuse of process, element. 1998–NMSC–001, ¶¶ 21, 22, 28, 124 N.M. 512, 953 P.2d 277. In the present case, if one of the two means were required to be selected to prove the misuse of process element, only the procedural impropriety means is applicable.

{90} Weststar's decision to tell Boutelle that it wished to proceed was not based solely on the letter from Jackson's lawyer, but on the entire set of circumstances. *See* Majority Opinion ¶ 32. Weststar's belief that Jackson was holding on to money that he had no right to hold on to and that it appeared he did not intend to return the full amount was objectively reasonable as a matter of law. That is the issue. It is not whether Weststar had probable cause to believe a crime had been committed. The jury had no business considering (if it did) whether a reasonable person would or would not have believed that Jackson was guilty of a criminal offense.

{91} Under this probable cause non-issue, the majority raises and discusses another non-issue, misleading information. Misleading and incomplete information have never been an issue below. They were not argued. The jury was not given the issue, and it had no basis on which to get into that question. Boutelle did not testify that any information or statement he received was misleading. No evidence exists of any concern on his part or on the part of the district attorney about the accuracy or reliability of any information or statement. No evidence exists that any purported incorrect information was in any respect material to the decisions of Boutelle, the district attorney, or the magistrates. Even were this an issue, I respectfully disagree with the majority that Weststar gave Boutelle misleading information, much less material, misleading information on which Boutelle or the district attorney relied. Majority Opinion ¶¶ 33–35. I further respectfully disagree with the majority's conclusion

that a jury could find the beliefs of the district attorney and the magistrates were based on incomplete knowledge of material facts known to Weststar. Majority Opinion ¶ 33.

{92} The majority discusses controverted evidence concerning the location of the money in Jackson's hands and whether he intentionally placed it out of Weststar's reach. Majority Opinion ¶¶ 23, 34, 37–38. The issue in this case is not whether Jackson had the money in one account or another. The issue is not whether Jackson acted with intent to commit a crime or committed a crime. The only valid issue relating to probable cause is whether Weststar reasonably believed the facts it presented to Boutelle were true. Whether Weststar had such reasonable belief was not questioned or at issue. In addition, whether the beliefs of the district attorney or the magistrates were based on incomplete knowledge or on false statements was not an issue. It was not argued. It was not before the jury for consideration.

{93} Citing *DeVaney*, 1998–NMSC–001, ¶ 41, 124 N.M. 512, 953 P.2d 277, the majority holds the question of probable cause is properly for the jury where the facts are in dispute. Majority Opinion ¶ 29. *DeVaney* states "[t]he existence of probable cause is a matter of law and shall be decided by the trial judge." 1998–NMSC–001, ¶ 41, 124 N.M. 512, 953 P.2d 277. *DeVaney* also says where unresolved disputed facts material to the issue of probable cause exist, the court is precluded from resolving the issue as a matter of law. *Id. DeVaney* relies on *Leyser v. Field*, 5 N.M. 356, 362–63, 23 P. 173, 174 (1890), and the Restatement (Second) of Torts § 681B(1)(c). *Leyser* quoted 'the celebrated case of *Sutton v. Johnson*' in which the rule was thus laid down:

> "The question of probable cause is a question of law and fact. Whether the circumstances alleged to show probable cause are true, and exist, is a matter of fact; but supposing them to be, whether they amount to probable cause, is a question of law."

*Id.* at 362, 23 P. at 174. "This doctrine is generally adopted." *Id.* "We know that what facts or circumstances amount to probable cause is a question of law for the court." *Hughes,* 44 N.M. at 542, 105 P.2d at 499.

{94} I will leave unaddressed for now the apparent lack of clarity on the question of whether the court or the jury decides whether probable cause exists. The decisive point is that, even were Weststar's reasonable belief at issue in this case, no evidence exists to place Weststar's objectively reasonable belief as to the circumstances in dispute. On that question, Weststar passes muster as a matter of law.

## 2. Jackson's Guilt and Termination of Criminal Proceedings (Majority Opinion ¶¶ 36–38)

{95} Weststar raises issues of Jackson's guilt and termination of the proceedings. These issues require very little discussion. The manner in which the criminal proceedings were terminated is useful, if at all, only to complete a picture. The criminal prosecution was dismissed. While the dismissal was not based on acquittal, it was nevertheless a good outcome for Jackson. That favorable outcome, however, "is not an element of an action for malicious abuse of process." *DeVaney*, 1998–NMSC–001, ¶ 23, 124 N.M. 512, 953 P.2d 277. The evidence has no bearing one way or the other on the outcome of this case. Further, whether Jackson was guilty or not is irrelevant. That a jury could conclude Jackson was innocent of the crime of larceny is irrelevant. Whether the deprivation of the money was intended to be permanent or not is irrelevant. Even were it relevant, the belief that Jackson intended a partial or indefinite deprivation came from the entirety of the circumstances, not just from the movement of the funds from a certificate of deposit.

{96} Furthermore, the parties' disagreement over whether the conduct was at most a civil conversion or constituted criminal theft of mis-delivered property is of no consequence. The important point is that Jackson took advantage of mistakenly credited funds by forming an intent to keep a portion of the money with no justification or even arguable justification for doing so. Public policy does not fault Jackson for his initial query about what he should do with the funds. Public

licy commands that, upon reflection, he estore the funds to the owner, without first causing the owner to have to resort to civil action or to report the circumstances to law enforcement authorities. The dishonesty arose when Jackson decided he could get away with keeping a part of the money even though it belonged to someone else.

### 3. Misuse of Process (Majority Opinion ¶¶ 39–41)

{97} It appears that this "misuse of process" point is meant to support the *DeVaney* element of "an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim." Majority Opinion ¶ 17. The trial court specifically instructed on this element. While the element might fit the circumstances in *DeVaney*, it does not fit, nor is it essential to, this case. This misuse of process point in the majority opinion is little different than the next point in the opinion regarding primary motive. Majority Opinion ¶¶ 42–43. For affirmance, both points rely on proof of the threat of use, and use, of the criminal prosecution to compel Jackson to return the money he held. The majority's opinion does not distinguish between the second and third *DeVaney* elements. *See Conway*, 635 N.E.2d at 271 (stating that malicious prosecution and abuse of process, although distinct torts, have "the common ingredient of an improper purpose").

### F. The Conduct of Jackson, His Lawyer, and the Authorities

{98} I understand that our main focus is to be on the side of this story pertaining to Weststar's actions. We cannot, however, fail to take the conduct of others into consideration. We should not exclude Jackson's and his lawyer's conduct and the officer's and district attorney's actions in our analysis. Jackson's and his lawyer's conduct and the authorities' actions strengthen my view that Weststar cannot be saddled with initiation or procurement of the prosecution.

{99} By use of the very broad rule that one cannot use the criminal process to collect a debt, Jackson was able to obtain a verdict of $50,000 compensatory and

$150,000 punitive damages. Looking at the actions of those involved, one wonders how could this occur. Jackson was clearly a wrongdoer with an improper motive. He never expressed, and has never shown, the slightest colorable or arguable basis on which to keep Weststar's money. Jackson's wife, a bank employee, testified the money was to be returned when the certificate of deposit matured, and that she "never felt like the money was ours. I felt like it should be returned." There was no question in Mrs. Jackson's mind that all of the money needed to be returned. Jackson's lawyer was Jackson's agent, if not his accomplice, perhaps pushing Jackson into, and unquestionably supporting Jackson's wrongful conduct. The two of them set this mess in motion.

{100} The law enforcement official, if anyone at all, mishandled the procedure during the investigation stage. Right or wrong, it is the law enforcement officer or district attorney that chooses to await a citizen's attempt to obtain return of wrongfully held money or property before launching a police investigation. It is the law enforcement officer or district attorney who then decides to investigate or not. Following an investigation, it is the responsibility of the law enforcement officer and district attorney and whatever magistrates are required to be involved to determine whether probable cause exists to arrest and prosecute. If this is not so, our society is in trouble.

{101} Weststar, caught up in this tangled web of bad judgment, was turned into a wrongdoer rather than a victim. Those who initiated and created the circumstances for harm managed to turn this case on its head.

{102} The following circumstances simply cannot be disputed: Jackson made a decision not to return all the money, but rather to negotiate return of only a portion of it. We do not know whether he may have returned it all if "push came to shove" at some point. However, his unmistakable intent at the time of Boutelle's and the district attorney's institution of the criminal proceeding, as well as at the time of Weststar's institution of a civil proceeding, was to continue to hold the money. Jackson was holding the money, not

returning it, and giving all indications that this was, indeed, his "lucky day." He thought he could get away with negotiating and give up only a portion of the money. Jackson claimed no right, neither colorable nor arguable, to justify keeping any of the money. These were the circumstances confronting Weststar and law enforcement authorities. It is noteworthy, too, that Jackson eventually paid the money back after the criminal action was dismissed. That action was dismissed because the prosecution did not obtain Norwest documents before the deadline to take the case to trial.

## II. Misuse of Process/Primary Motive

{103} The majority "conclude[s] the evidence was sufficient to support a finding that Weststar used the criminal prosecution . . . to compel Jackson to return the money." Majority Opinion ¶ 41. This conclusion is based on Boutelle's conversation with Jackson's lawyer while a Weststar employee was present. *Id.* I respectfully disagree with the majority that "[g]iven the facts of this case, a reasonable jury could conclude that Boutelle was acting on behalf of Weststar and therefore Weststar should be charged with Boutelle's action," and that "Weststar [is] to be charged with all conduct it initiated or procured." *Id.* Based on Boutelle's telephone conversation with Jackson's lawyer while a Weststar employee was present, the majority makes Weststar the responsible and controlling party not only for choosing the option given it by Boutelle to give the "go ahead," but for Boutelle's statements to Jackson's lawyer, for the criminal complaint, and for the district attorney's decision to prosecute. No evidence exists in the record that Weststar asked Boutelle to call Jackson's lawyer on Weststar's behalf or that Boutelle and Weststar's employee had any conversation regarding what he was to say to Jackson's lawyer. A citizen-victim who is merely sitting in a police officer's office cannot be held derivatively responsible for the officer's actions and statements.

{104} The majority also "conclude[s] that substantial evidence supports the jury's finding that Weststar acted with an improper motive." Majority Opinion ¶ 43. Scrutinized

by the watchwords discussed at the beginning of this dissent (¶¶ 59–60), I do not think Jackson met his burden. The majority's conclusion is based on Weststar's saying it wanted its money back and would prefer to avoid a criminal trial, and because Weststar "would and could have dropped the criminal charges had Jackson repaid the money." Majority Opinion ¶ 43. But Weststar brought no "criminal charges." Boutelle and the district attorney brought the charges. No evidence exists Weststar would have been able to "drop" any charges. Before it was clear to Weststar it would not be receiving its money, Weststar would have preferred to avoid a criminal trial. That Weststar later indicated it no longer wanted to avoid a criminal trial does not,.as a matter of law, tip the scale to provide substantial evidence of a primary improper motive.

{105} Unable to obtain the return of the money through lawful requests, Weststar indicated its willingness to have the criminal matter go forward. Soon afterward, Weststar filed its own civil lawsuit, reflecting a motivation to collect through a civil lawsuit, leaving the pursuit of criminal charges and prosecution to the independent discretion, responsibility, and control of the law enforcement authorities, and leaving the vicissitudes and unpredictable outcome of the criminal process to those responsible for the prosecution. At no time did Weststar use the facts that Boutelle filed a complaint or that the district attorney succeeded through a preliminary hearing to bind Jackson over for felony prosecution to threaten Jackson or extract the return of the monies.

## III. What Precedent to Set

{106} In criminal prosecution cases, more than occurred here can be shown to send the issue of malicious abuse of process to the jury. I might look at this case differently if Boutelle or the district attorney had testified about some undue influence or pressure or that they were materially misled in some manner, or if there had been independent evidence of such conduct. I might read the circumstances differently if there had been a statement made by Weststar to Jackson that could be construed as a threat it would use

the criminal process to get its money back. Here, no such statement was ever made. Boutelle could not say Weststar 'wanted the criminal case to proceed for the purpose of leverage to help get the money back.

{107} The majority opinion paves the way toward making it a jury issue whenever a victim of wrongful, unlawful action goes to the police, files a civil action, and cooperates with the authorities in an ensuing criminal prosecution. It appears no mention can be made between citizen and authorities regarding what may occur if the alleged perpetrator were to return the money or property being wrongfully held, except at the risk of going to trial for malicious abuse of process.

{108} The important precedent to set is that citizens can feel free to go to the police with facts that show wrongful, possibly criminal conduct. *See Zamora*, 106 N.M. at 634, 747 P.2d at 929 ("A citizen, without fear of liability, may report information to the authorities upon mere suspicion."). The police and district attorney should decide whether and to what extent to investigate. That investigation might include talking with the alleged wrongdoer. In that conversation the authorities should make no threat. However, in the real world, that conversation with the wrongdoer could well turn to the question of giving back what the alleged wrongdoer has received or taken, and might also cause the officer to discuss with the reporting citizen-victim whether the citizen wants to continue to pursue the matter if the property or money is returned. The officer might discuss with both sides the extent of the investigation and how the results may relate to a criminal statute. In the real world, law enforcement, wrongdoer, and victim understand this give-and-take may occur. Reporting citizens might broach the question of getting the money or property returned as part of the citizen's initial conversation with the officer. The police may raise it first. The police should discuss the fact they are not collection agents. The authorities can, and do, distinguish between contractual obligations and criminal dishonesty, refusing to act in the former when contract debt is apparent, and investigating when criminal dishonesty is apparent. In those cases presenting reasonably arguable criminal conduct, the police may want to screen the matter by asking whether, if the citizen receives back what was taken, the citizen has an interest in a continued investigation, arrest, and prosecution. Unless abused by irresponsible or corrupt authority, this process can be good business for all parties, including the State, with no harm to the health, safety, or welfare of society, and justice still done.

{109} Boutelle, Jackson's own witness, testified about his separate conversations with Jackson and with Jackson's lawyer. In this trial examination, Jackson's trial counsel sought to show a process that implicated Weststar as the initiator and procurer of the criminal prosecution. Boutelle's testimony is significant on several fronts. I therefore set it out, lengthy as it is, in an appendix to this dissent. In summary, Boutelle describes his "common practice" and his "job" to try without threat and coercion to resolve this type of criminal circumstance before arrest and prosecution. He also describes his practice in such cases of talking to the victim about whether the victim wants to continue with the matter if the money in question were returned. Boutelle makes it clear that he and the district attorney can override, and have several times overridden, a victim's decision not to cooperate and continue with a prosecution if they feel it is in the best interest of the State. Yet, the authorities are busy and their docket is full. When the victim changes his or her mind about proceeding, Boutelle explains this to the district attorney. The district attorney often decides not "to mess with it if they don't want it." Boutelle testified he gave Weststar "the right to protest and say, 'well, let's not go any further,'" while at the same time making sure to clear up any misconception that the prosecution was for the purpose of getting the money back. Boutelle testified he could not take into consideration any payment back; it was irrelevant. "If Mr. Jackson had paid the money back, that would not change my pursuit of the criminal case." Boutelle further testified, "All indications were that [Weststar] intended to go through with this."

{110} Boutelle's testimony in the appendix is important because it shows his manner of

approaching a citizen-victim's concern about the conduct of a wrongdoer. It shows his rationale behind the approach. It indicates the thinking of a citizen-victim.

{111} The police and district attorneys are often overloaded with reports and investigations. From their point of view, there exist certain cases in which the best result is one in which an investigation might be shortened and a prosecution deemed unnecessary without harm to the system of justice, where a victim is happy with the return of the property or money.

{112} As for the citizen-victim, it is in our human nature to want to see criminal wrongdoers prosecuted. At the same time, it is in our human nature to forgive when the offender sincerely atones. And when an offender sincerely atones, it is often in our human nature not to want to see the offender prosecuted. It is not outside the nature of ordinary citizens to think in the following terms: If the offender apologizes and returns the goods, I'd just as soon not have him prosecuted; and if the offender fights, then I'd just as soon see him prosecuted. These entirely natural human reactions and emotions should not subject the citizen to substantial tort liability. Something more is required before allowing a jury to infer a malicious and improper use of process and a malicious and improper motive.

{113} The system turns bad when threats of criminal prosecution are made by citizens or authorities as leverage for action, or when evidence is presented showing the authorities are acting based on improper influence or motive. The system is misused when the citizen really does act with malice and ulterior motive and without reasonable basis, intentionally misleads the authorities, or exerts undue pressure or improper influence on a police officer or district attorney to the extent the law enforcement authority no longer exercises independent discretion and judgment as to whether to prosecute someone.

{114} In the case here, the evidence fails as a matter of law to reach the level of initiation or procurement by Weststar of the criminal prosecution of Jackson. The evidence also fails as a matter of law to constitute sufficient evidence for jury consideration of primary improper motive. I would reverse the jury verdict and judgment.

**Concurrence in Part**

{115} I concur in the majority's holding that NMSA 1978, § 56–8–4(A) (1993) requires a trial court to apply post-judgment interest to an award of punitive damages.

## APPENDIX

### Boutelle's Call With Jackson

A. ... I left a message ... for [Jackson] ... and he had returned the call. This was long before I came to completion of this case. And he acknowledged to me that, yes, he had received the money and he was told by [Jackson's lawyer] it was his. And man to man I spoke to Mr. Jackson and said, 'He is leading you wrong. He is telling you wrong, and I hate to see you get in trouble for something because this attorney is leading you down the road.'

I said, 'There is a good possibility that, you know, you could be charged criminally with this because they have filed a complaint against you.'

I said, 'I will have to do my job. You know, is there anything we can do to resolve it?' I try to make that common practice. When I have a suspect accused of a similar nature-type crime, I call them and interview them and say is there something we can do to resolve this before you have to get arrested and go to jail.

Q. Is there something Mr. Jackson could have done to not get arrested and not go to jail?

A. I don't threaten. I don't coerce. I don't try to intimidate. All I do is give an offer of a way out of this mess and say, 'Listen, I don't like putting people in jail. I don't like arresting people. I have to do my job,' and I offered the same to him. I said, 'Is there any way that we can resolve this so that I can get back with the complainant and find out if we can close this matter out?'

Q. What could Mr. Jackson have done to close this matter out?

A. My suggestion to him was if he felt it reasonable to take and return the monies back to Weststar, and then file a complaint through the civil courts if he really felt the money was justified. There are legal ways of doing that. I offered the same to [Jackson's lawyer], but I got laughed at by [the lawyer].

Q. And the deal was pay the money back and there would be no criminal prosecution?

A. It was an option. It was an offered option.

Q. And that was based upon your understanding of what the alleged victim wanted to do?

A. I believe I could talk [to] the victim—not in that term, not talk the victim out of it, but I would consult with the victim, and say, 'Listen, you know, I understand Mr. Jackson paid the money back. From our initial contact, are you sure your attorneys and your supervisors want to continue with this? Let me know and we can go from there. I can close this out. It doesn't hurt my feelings any, you know.'

**Boutelle's Call With Jackson's Lawyer**

Q. The third sentence [of the report] you [Boutelle] write that you advised [Jackson's lawyer] you would be working a criminal intent investigation against [Jackson] if they refused to work with the victim. Did you write that?

A. Yes, I did.

Q. And that's what you told [Jackson's lawyer], right?

A. Yes.

Q. And Ms. Lynch was present when you told him that?

A. Right.

Q. And that's the way the whole thing played out, right?

A. Well, yes. It is my job. She came with a complaint to investigate it. She asked for my assistance to investigate. I advised [Jacksons' lawyer] that, you

know—he was getting ugly with me on the phone. So I said, '. . . come on let's be reasonable. Don't be stupid here. I think you are advising your client wrong.'

I said, 'You know, from what I see here initially there is already enough for me to pursue this further.'

I said, 'You know, I'm going to have to do this unless I'm called off of it because it has been resolved before I get to that point.'

Q. Why would you be called off?

A. Well, when I get completed with an investigation, there's an unwritten rule that we take everything to the district attorney['s] office for their review and approval, make sure that I've done all of my work properly and they are agreeable to go ahead and continue prosecution, because the district attorney is ultimately responsible for the criminal trial.

Once I review it with them, I get either the okay or the no, we won't take it, answer from them. Should I even get to that point, and the victims come through and say, 'Well, we've changed our mind. We don't want to continue with this any further.' I go back to the district attorney and say, 'Listen, this is what we have. The victim really does not want to pursue it any further.' The majority of the time the district attorney says, 'Fine, we're busy. Our docket is too [full]. We don't want to mess with it if they don't want it.' Because we're there for the victims, and to make the crime right, okay.

We can override that and use the victim as a hostile witness if we need to, if we feel it is in the best interest of the state. We have done that several times, but the majority of the time we say, 'Okay, listen it is not my time ticking. If you don't want it done, I'm not going to waste my time, and the state's time and all of the money and expense of going to trial. You know, fine. We've got the problem corrected, and we'll dismiss it.'

Q. And what was—in your initial meeting with Ms. Lynch, what was your understanding of the intent of Weststar as it

relates to criminal prosecution, whether to proceed or not?

A. All indications were that they intended to go through with this.

Q. Was there any event that could have happened that would have, in your mind, in your impression of Ms. Lynch, that would have led them not to go through with this?

A. I explained to her the same thing I explained to you, that at any time should there be any question about this, you know, that they would have the right to protest and say, 'Well, let's not go any further.' At the same time I explained that we are not a collection agency. Most people have that misconception. They come in and say, 'I want you to prosecute this guy because I want my money back. I want my property back.'

I say, 'I'm sorry. We can't do that.' Hopefully, the Court, if a criminal prosecution is successful the courts can order that the defendant pay restitution, but that is not part of my job to see that happen.

. . . .

Q. Did you have any sense from Ms. Lynch as to whether the payment or nonpayment of Mr. Jackson of the debt that was claimed would have any effect on Weststar's decision to prosecute?

A. Well, there is always that possibility. This is what I explained to her, that I could not take into consideration any of the payment back to the company, as far as my actions. That was irrelevant. If Mr. Jackson had paid the money back, that would not change my pursuit of the criminal case. Only the representative's decision not to continue with criminal prosecution for whatever their reasons were, and just say, 'Okay we've had enough. We don't want to go no further. Please drop it.' I would say, 'Fine.'