2003-NMCA-029

62 P.3d 1271

**Jim DAWLEY and Kent Building Company, Inc., a Colorado Corporation, Plaintiffs–Appellants,**

v.

**LA PUERTA ARCHITECTURAL ANTIQUES, INC., a New Mexico Corporation, d/b/a, La Puerta Architectural Antiques, Scott Coleman, and Mark Griffith, Defendants–Appellees.**

No. 22,063.

Court of Appeals of New Mexico.

Dec. 19, 2002.

David B. Lawrenz, Hinkle, Hensley, Shanor & Martin, L.L.P., Santa Fe, NM, for Appellants.

Robert E. Tangora, Robert E. Tangora, L.L.C., Santa Fe, NM, B. Cullen Hallmark, Garber & Hallmark, P.C., Santa Fe, NM, for Appellees.

*OPINION*

BOSSON, Chief Judge.

{1} In this appeal from a judgment for the tort of malicious abuse of process, we discuss the element of misuse of process in the context of a civil lawsuit for damages filed without probable cause. Finding that substantial evidence supports the district court's conclusion that the underlying lawsuit was brought without the necessary probable cause, we affirm the judgment. We also discuss the contours of when a trial judge must recuse upon being accused of bias and partiality toward one of the parties.

**BACKGROUND**

{2} In February 1997, James Dawley and La Puerta Architectural Antiques entered into a written contract, whereby La Puerta agreed to construct thirteen custom doors and two other items for a ranch home that Dawley was building in Ridgeway, Colorado. The ranch is situated on approximately 257 acres and consists of four buildings, covering 25,000 square feet. The construction cost of the Ridgeway project was "about 10 or 11 million dollars," which Dawley testified that he paid for "out of pocket." At the time of trial, the ranch was for sale at an asking price of twenty-seven million dollars.

{3} Dawley chose La Puerta because he was interested in doors constructed of antique mesquite and sabino (bald cypress) wood and La Puerta works with these scarce materials. The total contract price was $70,200, after La Puerta agreed to discount the original price by 10 percent. The contract required a deposit of half the contract price, or $35,100, of which Dawley paid only $20,000.

{4} Dawley hired several agents to assist with the Ridgeway project, including an architect, a contractor, a project manager, and an on-site liaison. Dawley hired the architect to design the project and "make sure that [his] vision was carried out." Dawley also hired a professional building contractor and a project manager who were responsible for overseeing the construction and managing subcontracts. Finally, Dawley hired an on-site liaison to act as his local representative and to assist in expediting various aspects of the project, such as negotiating discounts and other details with La Puerta. Dawley testified that he communicated regularly with these agents, who were authorized to act on his behalf, and routinely received copies of field reports and project meeting

minutes. The roles of these various agents appeared to overlap at times. For example, the on-site liaison testified that three different agents would have spoken with La Puerta about the construction of a preliminary door sample.

{5} After numerous communications between La Puerta and Dawley's agents, La Puerta submitted a 2–by 2–foot corner section sample of a door for approval by Dawley and his architect. Dawley's on-site liaison was aware that the corner section sample would be constructed of fir, rather than sabino, and that the design would be cut using La Puerta's stock shaper knives, rather than the custom blades that would be required to match the architect's design specifications. Because Dawley was demanding an additional discount, La Puerta viewed the sample as a means of illustrating ways they could accommodate Dawley's demands for a price reduction and as "part of a 'dialogue' in the ongoing negotiations over the choices of woods and other details."

{6} By this time, the contract had already been informally modified by the parties. Some of the items originally ordered had been cancelled or put on hold. Dawley had also agreed to the use of a laminate or veneer process, partly because solid mesquite and sabino would be very heavy and might cause structural problems, and partly because it was questionable whether these rare, antique woods could be obtained in the dimensions necessary for solid construction.

{7} When Dawley and his architect received the corner section sample in April 1997, they were highly displeased. Not only was the sample constructed of fir, rather than sabino, but Dawley and his architect were dissatisfied with the workmanship and felt the sample did not conform to the design specifications. At Dawley's request, his building contractor sent La Puerta a letter which cancelled the contract and requested the return of the $20,000 deposit.

{8} When La Puerta did not return the deposit in full, Dawley filed a lawsuit, alleging breach of contract, violation of the Unfair Practices Act, violation of the Uniform Commercial Code, conversion, and fraud. Only the breach of contract claim and the Unfair Practices Act claim remained by the close of trial.

{9} La Puerta brought numerous counterclaims against Dawley. The district court granted Dawley's motion for summary judgment on La Puerta's counterclaims for tortious interference with contract and intentional infliction of emotional distress. By the time of trial, two counterclaims remained: one for breach of contract and one for malicious abuse of process.

{10} Following a three-day bench trial, the district court determined that "the contract was ignored by Dawley and, to a large extent, by La Puerta." Because of this course of conduct between the parties, the court ruled that neither party had a valid claim for breach of contract. The court concluded that "[i]n legal effect, the parties mutually consented to the termination of the contract, disagreeing only on the appropriate disposition of the $20,000 deposit."

{11} The court then dismissed Dawley's last remaining claim against La Puerta under the Unfair Practices Act, and granted judgment for La Puerta on its counterclaim for malicious abuse of process. The court awarded compensatory damages in the amount of La Puerta's attorney fees and punitive damages in the amount of the original contract price. Dawley appeals that judgment on La Puerta's counterclaim.

## DISCUSSION

### Malicious Abuse of Process

{12} Dawley challenges the legal and factual sufficiency of the district court's judgment on La Puerta's counterclaim for malicious abuse of process. In determining whether the evidence is legally sufficient to support the district court's decision, we resolve all disputes of fact in favor of the successful party and indulge all reasonable inferences in support of the judgment. *Las Cruces Prof'l Fire Fighters v. City of Las Cruces,* 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. On appeal, we do not re-weigh the evidence or substitute our judgment for that of the fact-finder, but determine whether substantial evidence supports the result reached. *Id.*

{13} Although we apply a substantial evidence standard of review, we are mindful that the tort of malicious abuse of process must be construed narrowly to protect the right of access to the courts. *DeVaney v. Thriftway Mktg. Corp.*, 1998–NMSC–001, ¶ 19, 124 N.M. 512, 953 P.2d 277 (stating that tort is traditionally disfavored because of "potential chilling effect on the right of access to the courts"); *see also Weststar Mortgage Corp. v. Jackson*, 2002–NMCA–009, ¶¶ 59, 62, 131 N.M. 493, 39 P.3d 710 (Sutin, J., dissenting in part) (arguing that "[c]ourt scrutiny of malicious abuse of process actions is more demanding than that required in garden variety tort actions," while acknowledging that sufficiency of evidence is the appropriate standard of review).

{14} The tort of malicious abuse of process is defined by the following elements: "(1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) *an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim;* (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages." *DeVaney*, 1998–NMSC–001, ¶ 17, 124 N.M. 512, 953 P.2d 277 (emphasis added). Malicious abuse of process combines the closely related torts of abuse of process and malicious prosecution, and attempts "to strike a balance between the interest in protecting litigants' right of access to the courts and the interest in protecting citizens from unfounded or illegitimate applications of the power of the state through the misuse of the courts." *Id.* ¶ 14.

{15} In this appeal, Dawley does not challenge the sufficiency of the evidence to support the element of improper motive. *See id.* ¶ 17. We agree. For example, La Puerta's president testified that when he and Dawley first discussed the possibility of a contract for the Ridgeway project, Dawley told him that the project could do great things for La Puerta, but that "if [La Puerta was] not able to make [Dawley] happy ... he could put [La Puerta] out of business." When La Puerta refused to return the $20,000 deposit in a single cash payment, Dawley reminded La Puerta's president of this earlier conversation. The district court concluded that "Dawley desired to teach La Puerta a lesson in power and instituted the present lawsuit with that illegitimate purpose, knowing that La Puerta was in [a] considerably inferior economic position."

{16} Dawley does not deny that he initiated proceedings against La Puerta or that La Puerta incurred damages as a result. *See id.* This leaves for our discussion the element of misuse of process. *Id.*

**Misuse of Process**

{17} An improper act in the use of process, or misuse of process, can be demonstrated in one of two ways: either through filing an action without probable cause or through some irregularity or impropriety suggesting extortion, delay, or harassment. *Id.* ¶¶ 21, 22, 28. La Puerta argues the first alternative: that Dawley filed a lawsuit against it without probable cause. *See id.* ¶ 18 (discussing malicious abuse of process and stating that the element of lack of probable cause "serve[s] to protect the important interest of access to the courts, thereby preventing any chilling effect on the legitimate use of process"); *see also Richardson v. Rutherford*, 109 N.M. 495, 502, 787 P.2d 414, 421 (1990) ("[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions ...." (quoting W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, & David G. Owen, *Prosser and Keeton on the Law of Torts* § 121, at 898 (5th ed.1984)) (hereinafter "Prosser and Keeton")).

{18} For the purpose of demonstrating misuse of process, probable cause is defined as "the reasonable belief, founded on known facts established after a reasonable pre-filing investigation." *DeVaney*, 1998–NMSC–001, ¶ 22, 124 N.M. 512, 953 P.2d 277. We apply an objective standard in reviewing for probable cause in a tort action and determine whether a party's belief was reasonable, based on "facts established after a reasonable pre-filing investigation." *Id.; see also* Prosser and Keeton, *supra,* § 119, at 882 (stating that "the court will determine whether upon the appearances presented to the

defendant, a reasonable person would have instituted the proceeding," which "does not differ essentially from the determination of negligence"); Prosser and Keeton, *supra,* § 120, at 893 (stating that "less in the way of grounds for belief will be required to justify a reasonable man in bringing a civil rather than a criminal suit ... [and the] want of probable cause must be 'very clearly proven' or 'very palpable' ") (footnotes omitted). *See generally* Restatement (Second) of Torts § 675 cmt. d (1977) (discussing the existence of probable cause related to wrongful civil proceedings and stating that "the initiator of private civil proceedings need not have the same degree of certainty as to the relevant facts that is required of a private prosecutor of criminal proceedings").

{19} In challenging the judgment against him for malicious abuse of process, Dawley first argues that the district court never made a specific finding regarding the element of misuse of process or a finding that Dawley lacked probable cause to initiate his lawsuit. However, "[u]nless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than to reverse it." *Herrera v. Roman Catholic Church,* 112 N.M. 717, 721, 819 P.2d 264, 268 (Ct.App.1991). "If, from the facts found, the other necessary facts may be reasonably inferred, the judgment will not be disturbed." *Id.*

{20} The district court made the following findings and conclusions which, taken together, are the substantial equivalent of a finding that Dawley lacked probable cause. *See id.*

Based on his determination that the [door] sample was unacceptable and that it meant that the doors would be equally unacceptable, Dawley instructed [his contractor] to terminate the contract and demand his $20,000 deposit back. At the time, Dawley did not know that *his agents had authorized the sample to be of different woods or somewhat different design.* . . . .

La Puerta agreed to return the deposit but balked at giving back all of it in cash. Instead, they offered various plans for repaying the deposit, including an equivalent amount in store credit and providing to

Dawley a door they had partly constructed [apparently as a time-study model]. . . . During settlement negotiations, La Puerta even offered to pay back the $20,000 in full but over time. None of these suggestions was acceptable to Dawley.

(Emphasis added.)

Dawley desired to teach La Puerta a lesson in power and instituted the present lawsuit with that illegitimate purpose, knowing that La Puerta was in [a] considerably inferior economic position.

. . . .

... Dawley intentionally maintained a *meritless lawsuit* with knowledge that the act was wrongful and with knowledge that harm to La Puerta would result.

(Emphasis added.) The district court did not use the term "probable cause." However, we may reasonably infer from the court's findings and conclusions that the district court did find, at least implicitly, that Dawley lacked probable cause to maintain this "meritless lawsuit" against La Puerta. *See id.*

{21} We now turn to the sufficiency of evidence supporting the court's determination that Dawley lacked probable cause to bring this lawsuit. *See DeVaney,* 1998–NMSC–001, ¶ 22, 124 N.M. 512, 953 P.2d 277 (describing lack of probable cause for purposes of establishing misuse of process); *Richardson,* 109 N.M. at 502, 787 P.2d at 421 (determining that abuse of process may be found in the filing of a complaint itself); *Weststar,* 2002–NMCA–009, ¶¶ 27, 32, 131 N.M. 493, 39 P.3d 710 (concluding that the evidence was sufficient to support a finding that defendant lacked probable cause to procure plaintiff's prosecution).

### Lack of Probable Cause

{22} Dawley brought claims against La Puerta for breach of contract and for violations of the Uniform Commercial Code and the Unfair Practices Act. *See* Uniform Commercial Code, NMSA 1978, § 55–2–712(1), (2) (1961) (concerning "cover" or buyer's procurement of substitute goods and buyer's damages for non-delivery or repudiation); *see also* Unfair Practices Act, NMSA 1978, § 57–12–2(D) (1999) (defining unfair trade

practices as misrepresentations that are "knowingly made"); § 57–12–2(D)(7) ("representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another"); § 57–12–2(D)(15) ("stating that a transaction involves rights, remedies or obligations that it does not involve"); § 57–12–2(D)(17) ("failure to deliver the quality or quantity of goods or services contracted for"). Mid-trial, the court granted La Puerta's motion to dismiss Dawley's claims under the Uniform Commercial Code. Ultimately, the district court determined that Dawley's surviving claims against La Puerta for breach of contract and violation of the Unfair Practices Act were not supported by credible evidence.

{23} We must determine whether there was substantial evidence that Dawley lacked probable cause to bring these claims against La Puerta. Few New Mexico cases discuss lack of probable cause in this context, particularly in regard to what constitutes probable cause to bring a civil lawsuit as opposed to filing a criminal complaint. *See Kumor v. Graham*, 39 N.M. 245, 247–48, 44 P.2d 722, 723–24 (1935) (affirming malicious prosecution claim, and finding sufficient evidence of malice and lack of probable cause, where defendant instituted criminal prosecution against plaintiff for the purposes of causing the removal of plaintiff's cattle from a tract of homestead land that defendant had been occupying); *Marron v. Barton*, 34 N.M. 516, 517–18, 285 P. 502, 502 (1930) (affirming malicious prosecution claim where defendant attached the household goods of plaintiff, wrongfully, recklessly, and without probable cause); *Yucca Ford, Inc. v. Scarsella*, 85 N.M. 89, 92, 509 P.2d 564, 567 (Ct.App.1973) (holding that trial court did not err in denying garage manager's motion for directed verdict or judgment notwithstanding the verdict on malicious prosecution counterclaim verdict in favor of car owner, where there was evidence that garage manager signed a criminal complaint charging car owner with the unlawful taking of a vehicle, when he had no reasonable grounds for believing that car owner had committed any such violation). We are mindful that it is the plaintiff's burden to demonstrate lack of

probable cause notwithstanding the obstacles inherent in proving a negative proposition. *See Keefe v. Johnson*, 304 Mass. 572, 24 N.E.2d 520, 523 (1939) ("The plaintiff has the burden of proving lack of probable cause, although that is a negative proposition."). We are also aware that in this case La Puerta had the burden of persuading the court by clear and convincing evidence that Dawley lacked probable cause. *DeVaney*, 1998–NMSC–001, ¶ 25, 124 N.M. 512, 953 P.2d 277. We review the evidence mindful that La Puerta's claim for malicious abuse of process is not favored in the law and must not cause a chilling effect on Dawley's fundamental right of access to the courts. *Id.* ¶ 19.

**Breach of Contract**

{24} Dawley argued that La Puerta committed a material breach of contract when it submitted an unsatisfactory door sample. Although the written contract had not required a sample, the district court found that La Puerta had agreed to provide one. After Dawley examined the sample, he concluded that La Puerta would ultimately be unable to perform its contractual duties in a satisfactory manner. At Dawley's request, his building contractor wrote a letter to La Puerta, terminating the contract. The letter stated that "[t]he materials [used in the sample] were not as specified and the workmanship was not to [Dawley and his architect's] expectations." The letter ordered La Puerta to remit the $20,000 deposit "as soon as possible."

{25} However, Dawley's decision to terminate seemingly ignored the prior approval given by his own on-site liaison to the substitute materials. Dawley's on-site liaison had approved the materials used in the door sample because La Puerta did not want to "waste a good piece of sabino in a sample." Also, because Dawley was demanding an additional 20 or 25 percent discount, La Puerta wanted to illustrate what the doors might look like if Dawley agreed to the use of less expensive materials. The on-site liaison had also agreed that La Puerta could submit a sample cut with La Puerta's existing shaper knives, rather than the custom shaper knives that La

Puerta would have needed to match the design specifications created by Dawley's architect.

{26} La Puerta's officers testified that they viewed the sample, not as a means of demonstrating La Puerta's ultimate ability to meet its contractual obligations, but as a preliminary negotiation tool in an ongoing dialogue concerning production costs and materials. Although Dawley apparently expected the sample to demonstrate what the finished doors would look like, Dawley's project manager and his building contractor testified that samples from other sub-contractors were routinely discussed with those sub-contractors, who were then given feedback and suggestions for changes.

{27} A few weeks before the arrival of the sample, Dawley's architect informed Dawley that La Puerta could only offer an additional discount if the doors were constructed of fir or alder. Dawley's on-site liaison testified that he told either the architect or the project manager to expect the sample to be made of fir. The on-site liaison also testified that he generally spoke with Dawley several times a week and with the architect on a daily basis. Despite this testimony from his own agents, Dawley denied being aware that his agent had consented to a sample made of fir, not sabino. As factfinder, the district court was free to disbelieve Dawley's testimony. *See Jackson Nat'l Life Ins. Co. v. Receconi*, 113 N.M. 403, 412, 827 P.2d 118, 127 (1992) ("[N]otice to an agent, or knowledge imparted to him, is notice to the company, regardless of whether or not the agent actually communicat[ed] the information to the company."); Restatement (Second) of Agency §§ 268, 272 (1958) (stating that notification to an agent is considered notification to the principal if the agent is authorized or apparently authorized to receive the notification).

{28} Furthermore, a reasonable pre-filing investigation should have alerted Dawley that his agent had consented to a door sample that was constructed of fir and not cut with custom shaper knives. Dawley testified that he "believe[d]" he had consulted with his on-site liaison and project manager before he filed a lawsuit. Dawley did not otherwise present evidence that he performed a reasonable pre-filing investigation. *See DeVaney*, 1998–NMSC–001, ¶ 22, 124 N.M. 512, 953 P.2d 277 (describing probable cause as "the reasonable belief, founded on known facts established after a reasonable pre-filing investigation"). Before Dawley filed a lawsuit, a letter from La Puerta to Dawley clarified La Puerta's understanding of the sample: "The sample you rejected was submitted for the purpose of showing what the product would look like using alternative materials in order to meet your limited budget.... Unfortunately, we were not allowed to continue the refinement of the project and the subsequent prototypes." Even after Dawley's on-site liaison was deposed and acknowledged that he had approved the fir sample, Dawley remained undeterred and continued to pursue his claims against La Puerta.

{29} In sum, Dawley's agent, acting on Dawley's behalf, approved a preliminary sample that deviated from the original design specifications, a fact which Dawley should have discovered by a reasonable pre-filing investigation. Substantial evidence supports the court's conclusion that Dawley lacked a reasonable factual basis for believing that La Puerta's corner section sample constituted a breach of contract.

## Uniform Commercial Code

{30} In the middle of trial, the court granted La Puerta's motion to dismiss Dawley's claims under the Uniform Commercial Code. *See* § (1), (2) (concerning "cover" or buyer's procurement of substitute goods and buyer's damages for non-delivery or repudiation). Essentially, Dawley argued that La Puerta violated the Uniform Commercial Code because it delivered nonconforming goods. However, as the district court pointed out, the corner section door sample was not a true "sample" or an example of the goods themselves, but, rather, was a preliminary model or prototype that preceded the delivery of actual goods. La Puerta did not "deliver" non-conforming "goods," nor was La Puerta afforded an opportunity to deliver actual goods. We agree with the district court that "the way [Dawley] use[s] the sample turns the UCC on its head." The district

court could reasonably have concluded that Dawley lacked probable cause to bring these claims under the Uniform Commercial Code.

### Unfair Practices Act

■ {31} Probable cause to bring Unfair Practice Act claims against La Puerta required a reasonable factual basis for Dawley to allege that La Puerta made *knowing* misrepresentations. *See* § 57–12–2(D) (defining unfair trade practices as misrepresentations that are "knowingly made"). We first address the Unfair Practices Act claims involving the corner section door sample. Dawley alleged that La Puerta misrepresented its ability to produce goods of a particular quality or grade and failed to deliver the goods for which they contracted. *See* § 57–12–2(D)(7) ("representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another"); § 57–12–2(D)(17) (1995 Replacement Pamphlet) ("failure to deliver the quality or quantity of goods or services contracted for").

{32} Rather than finding that La Puerta made knowing misrepresentations, the district court determined that there had been a misunderstanding about the purpose of the door sample.

> Owing to the confusion of La Puerta, resulting from dealing with various agents of Dawley who did not always talk to each other or to Dawley, La Puerta attempted to find ways to save Dawley money by suggesting the use of cheaper woods and the use of existing cutting knives. La Puerta reasonably believed that these suggestions were being fairly considered by Dawley.

As we have previously discussed, Dawley cancelled the contract before La Puerta delivered any actual goods. The proffer of a preliminary sample that Dawley found unacceptable does not support Dawley's assertions that La Puerta *knowingly misrepresented* its ability to produce and deliver high quality goods constructed of the desired materials. The district court could reasonably have found that Dawley lacked any objective factual basis to allege that La Puerta violated the Unfair Practices Act through its submission of the corner section door sample.

■ {33} One of Dawley's Unfair Practices Act claims concerned La Puerta's representations regarding the purpose of the $20,000 that Dawley paid toward the deposit. *See* § 57–12–2(D)(15) ("stating that a transaction involves rights, remedies or obligations that it does not involve"). Dawley's complaint alleged that La Puerta violated the Unfair Practices Act by stating that "La Puerta had the right to retain $12,000.00 of the $20,000.00 ... [and] made this representation, [knowing] that Mr. Dawley had not signed off on final drawings for the door which La Puerta had allegedly constructed."

{34} Dawley argues that La Puerta knowingly misrepresented the nature of the deposit because La Puerta constructed a "time study door," to identify and solve problems in the construction process, knowing that Dawley's consent was required and that final drawings had not yet been approved. La Puerta's president testified that the time study door was constructed to facilitate communication with La Puerta's employees about details of the construction process. La Puerta believed this was necessary because the Ridgeway project's production deadlines would have required La Puerta to significantly reduce its usual production time. After Dawley cancelled the contract and demanded the return of the full $20,000, a letter from La Puerta offered Dawley *either* $20,000 in store credit, *or* an $8,000 cash refund and ownership of the time study door, which had cost $12,000 to produce.

{35} The terms of the sales agreement signed by Dawley provide that a client who cancels a sales agreement within three business days is entitled to a full cash refund; after that time, deposits may be converted to store credit, less a non-refundable 15 percent. La Puerta offered store credit which Dawley refused. Dawley did not present evidence that the contract entitled him to a full cash refund upon his termination of the sales agreement.

{36} The district court could have found that Dawley lacked a reasonable basis for believing that La Puerta made a knowing misrepresentation about the deposit. La

Puerta merely offered Dawley *the option* of receiving either a partial cash refund, less the cost of the time study door, *or* the full $20,000 in store credit. The district court could have properly found that this claim, too, lacked probable cause.

### Fraud and Conversion

{37} Dawley also brought fraud and conversion claims, which were abandoned before trial. Dawley asserts that he had a reasonable factual basis for his fraud and conversion claims because, he argues, La Puerta fraudulently misrepresented the nature of the deposit and wrongfully retained the $20,000. Dawley alleged that La Puerta "did not disclose ... that [they] would treat the $20,000 payment as a non-refundable 'deposit' in the absence of [Dawley] approving final drawings for the Merchandise" and fraudulently spent Dawley's money on the unapproved time study door. These claims closely resemble the Unfair Practices Act claim related to the deposit, and for similar reasons they do not persuade us.

### Summary of Claims

{38} In light of the foregoing discussion of each of Dawley's numerous claims against La Puerta, we conclude that the evidence elicited at trial supports the district court's conclusion that Dawley lacked probable cause, or in the words of the *DeVaney* court, a "reasonable belief, founded on known facts established after a reasonable pre-filing investigation, that a claim can be established to the satisfaction of a court or jury." *DeVaney*, 1998-NMSC-001, ¶ 22, 124 N.M. 512, 953 P.2d 277 (citation and footnote omitted). The core of that evidence supporting the district court lies in the knowledge and acquiescence of Dawley's own agent, his on-site liaison. Such unusual direct evidence against Dawley, and fair inferences the district court was entitled to draw from that evidence, helps set this case apart from the garden variety claim for breach of contract. Our opinion affirming the judgment below should not, then, be misconstrued as a retreat from the narrow and restricted place in our jurisprudence to which our courts appropriately have assigned the tort of malicious abuse of

process. *See id.* ¶ 19 ("Meaningful access to the courts is a right of fundamental importance in our system of justice."); Prosser and Keeton, *supra*, § 119, at 876 (stating that malicious prosecution "has never been regarded with any favor by the courts, and it is hedged with restrictions which make it very difficult to maintain").

### Judicial Impartiality

{39} Dawley contends that the district court abused its discretion because it denied his motion for a new trial based on the court's alleged partiality and bias toward him. According to Dawley, the court "expressed a negative, biased opinion based on socioeconomic status, to wit, that all wealthy people use their financial strength to impose their will on those with fewer financial resources." Dawley relies on Code of Judicial Conduct Standard, Rule 21–400(A)(1) NMRA 2002, which provides that a judge "shall recuse himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where ... the judge has a personal bias or prejudice concerning a party[.]" In order to be disqualifying, the bias or prejudice must " 'stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.' " *United Nuclear Corp. v. General Atomic Co.*, 96 N.M. 155, 247, 629 P.2d 231, 323 (1980) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). We review a district court's decision to recuse for an abuse of discretion. *State v. Cherryhomes*, 114 N.M. 495, 500, 840 P.2d 1261, 1266 (Ct.App.1992).

{40} Dawley questions the court's impartiality because of statements made at the close of trial, in which the court made reference to *The Great Gatsby* and opined that "[e]arly success leads to a romantic view wherein happy expectations are always to be met. . . . [T]he privilege of wealth creates in the holder of wealth a sense of entitlement, and they display a great reluctance to spend money to obtain what they believe is due them. In my experience, to put it bluntly, wealthy people don't pay retail." The court

went on to state that Dawley had "[used his] wealth or more properly the promise of a share of it to bludgeon people like [Dawley's architect and contractor] and La Puerta to reduce their prices in order to continue working with them.... Perhaps it's the way of the world—big dogs eat first."

{41} La Puerta responds that these judicial statements were based on the facts of record and not from any extrajudicial source; they were the result of the court's own observation of Dawley during trial. For example, in addition to repeatedly demanding discounts from La Puerta, Dawley obtained financial concessions from some of his own agents. Dawley persuaded his building contractor to reduce its usual contractor's fee. After La Puerta refused to return the deposit in cash, Dawley attempted to retain $20,000 from his own contractor's fees, until the contractor threatened to file a lien on the ranch. Eventually, Dawley persuaded the contractor to be joined as a party, withholding $10,000 of the contractor's fees, with the understanding that the contractor would receive $10,000 if Dawley were to prevail in the lawsuit against La Puerta. Dawley also persuaded his architect to renegotiate his usual fee arrangement and reduce the cost of his services.

{42} The analogy the court drew between Dawley and a well-known literary character does not establish any meaningful extrajudicial source. Whatever opinion the court held about Dawley sprang from the evidence at trial and from inferences the court was entitled to draw from that evidence. *See United Nuclear,* 96 N.M. at 247, 629 P.2d at 323 (stating that, to be disqualifying, alleged judicial bias must "result in an opinion on the merits on some basis other than what the judge learned from his participation in the case"). That evidence supported the court's conclusion that Dawley committed the tort of malicious abuse of process. Accordingly, the court did not abuse its discretion when it refused to withdraw from the case. *See In re Agnes P.,* 110 N.M. 768, 772, 800 P.2d 202, 206 (Ct.App.1990).

**Attorney Fees and Costs**

■ {43} In their prayer for relief, La Puerta makes a boilerplate request for attorney fees and costs. As Appellees, La Puerta does not have the costs identified in Rule 12–403(B)(1) or (2) NMRA 2002 (setting forth the costs of the docket fee, record proper, and transcript of proceedings), which are the most commonly taxed costs on appeal. Rule 12–403(B)(3) permits the taxation of reasonable attorney fees "where ... permitted by law." La Puerta cites no law for the proposition that attorney fees are recoverable as costs in a tort case, and we are unaware of any law permitting such recovery. *See New Mexico Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶¶ 9–31, 127 N.M. 654, 986 P.2d 450 (reaffirming that New Mexico follows the American rule, which does not ordinarily allow the recovery of attorney fees). The request for costs and fees is denied.

**CONCLUSION**

{44} For the foregoing reasons, we affirm the judgment of the district court.

{45} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and RODERICK T. KENNEDY, Judges.